# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ELAINE BLOCK-VICTOR, LISA DaSILVA,
and KIMBERLY NIKKILA,

                Plaintiffs,

v.

CITG PROMOTIONS, LLC, d/b/a EVIGNA,
a corporation,

                Defendant.

Hon. George Caram Steeh
Case No. 2:07-CV-12055

---

Michael L. Pitt (P24428)
Megan Bonanni (P52079)
Pitt, McGehee, Palmer, Rivers & Golden, P.C.
Counsel for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan  48067
(248) 398-9800

Timothy H. Howlett (P24030)
Allyson A. Miller (P71095)
Dickinson Wright PLLC
Counsel for Defendant
500 Woodward Avenue, Suite 4000
Detroit, Michigan  48226
(313) 223-3500
thowlett@dickinsonwright.com
amiller@dickinsonwright.com

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant CITG Promotions, LLC, d/b/a Evigna ("Evigna"), through its undersigned counsel, respectfully submits its motion for summary judgment under Fed. R. Civ. P. 56(c).

In support of its Motion, Evigna relies upon the law and argument set forth in the attached brief in support, and the exhibits and testimony referenced therein.

WHEREFORE, Evigna respectfully requests that the Court enter an Order granting its Motion for Summary Judgment in its entirety.

Respectfully Submitted,

DICKINSON WRIGHT PLLC

By:   s/Allyson A. Miller
       Timothy H. Howlett (P24030)
       Allyson A. Miller (P71095)
       Dickinson Wright PLLC
       Counsel for Defendants
       500 Woodward Avenue, Suite 4000
       Detroit, Michigan  48226
       (313) 223-3500
       amiller@dickinsonwright.com

Dated:  March 2, 2009

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ELAINE BLOCK-VICTOR, LISA DaSILVA,
and KIMBERLY NIKKILA,

          Plaintiffs,

v.

CITG PROMOTIONS, LLC, d/b/a EVIGNA,
a corporation,

          Defendant.

Hon. George Caram Steeh
Case No. 2:07-CV-12055

---

Michael L. Pitt (P24428)
Pitt, McGehee, Palmer, Rivers & Golden, P.C.
Counsel for Plaintiffs
117 West Fourth Street, Suite 200
Royal Oak, Michigan  48067
(248) 398-9800

Timothy H. Howlett (P24030)
Allyson A. Miller (P71095)
Dickinson Wright PLLC
Counsel for Defendant
500 Woodward Avenue, Suite 4000
Detroit, Michigan  48226
(313) 223-3500
thowlett@dickinsonwright.com
amiller@dickinsonwright.com

---

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF PRINCIPAL AUTHORITIES .................................................................... III

QUESTIONS PRESENTED.................................................................................. VI

I.  INTRODUCTION ..................................................................................... 1

II.  BACKGROUND ....................................................................................... 1

    A.  Evigna Purchases The Failing Business That Employed Plaintiffs ..................... 1

    B.  Evigna Reorganizes Its Sales Force And Develops Cost-Savings Strategies ....... 2

    C.  Plaintiff Elaine Block-Victor ......................................................................... 4

        1.  Block-Victor's Tenure At Evigna ........................................................... 4

        2.  Block-Victor's "Evidence" Of Age Discrimination ................................... 6

    D.  Plaintiff Lisa DaSilva.................................................................................. 6

        1.  DaSilva's Tenure At Evigna................................................................... 6

        2.  DaSilva's "Evidence" Of Age Discrimination ........................................... 8

    E.  Plaintiff Kimberly Nikkila ........................................................................... 9

        1.  Nikkila's Tenure At Evigna.................................................................... 9

        2.  Nikkila's "Evidence" Of Age And Weight Discrimination..................... 10

III.  ANALYSIS............................................................................................. 10

    A.  Standard For Summary Judgment................................................................ 10

    B.  Plaintiffs' Age Discrimination Claims Are Without Merit ............................... 11

        1.  Plaintiffs have failed to produce any direct evidence of age
            discrimination .................................................................................. 12

        2.  Plaintiffs have failed to establish a *prima facie* case of age
            discrimination under the *McDonnell Douglas* framework .................... 14

            a)  Plaintiff Block-Victor cannot establish that she was
                constructively discharged............................................................ 15

b)    Plaintiffs have failed to present evidence sufficient to warrant an inference of age discrimination.................................19

(1)    Plaintiffs' subjective beliefs cannot support an inference of discriminatory intent....................................20

(2)    Plaintiff Block-Victor was not replaced by a younger individual ..........................................................21

(3)    Plaintiffs DaSilva and Nikkila were never replaced, as their duties were divided among several individuals as part of a corporate reorganization plan................................................................................22

(4)    The alleged statements of Morrison and Amen are irrelevant and too isolated and ambiguous to constitute evidence of discriminatory intent..................24

c)    Even assuming *arguendo* that Plaintiffs can make out a *prima face* case, Evigna has articulated a legitimate, non-discriminatory reason for its actions............................................25

d)    Plaintiffs have failed to establish that Evigna's articulated reasons were pretextual................................................26

C.    Plaintiff Nikkila's Weight Discrimination Claim Is Also Without Merit ...........29

IV.    CONCLUSION..............................................................................................31

# TABLE OF PRINCIPAL AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 10

*Barnes v. GenCorp, Inc.*, 896 F.2d 1457 (6th Cir. 1990) ................................................. 15, 21, 22

*Blair v. Henry Filters, Inc.*, 505 F.3d 517 (6th Cir. 2007) ............................................. 11

*Borque v. Powell Electrical Mfg. Co.*, 617 F.2d 61 (5th Cir. 1980) ................................. 16

*Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890 (6th Cir. 1997) ..................................... 22, 23

*Brown v. Bunge Corp.*, 207 F.3d 776 (5th Cir. 2000) ................................................... 17

*Chappell v. GTE Prod. Corp.*, 803 F.2d 261 (6th Cir. 1986) ........................................... 20

*Coffman v. Tracker Marine, LP*, 141 F.3d 1241 (8th Cir. 1998) ..................................... 16

*Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994) ..................................... 12

*Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995) ..................................................... 10

*Dabrowski v. Werner-Lambert*, 815 F.2d 1076 (6th Cir. 1987) ....................................... 28

*Dubey v. Stroh Brewery Co.*, 185 Mich. App. 561; 462 N.W.2d 758 (1990) ....................... 14

*Felder v. Nortel Networks Corp.*, No. 05-5250, 2006 WL 1889275 (6th Cir. July 10, 2006) ..................................................................................................... 28

*Figgins v. Advance America Cash Advance Centers of Mich., Inc.*, 476 F.Supp.2d 675 (E.D. Mich. 2007) ................................................................................... 29

*Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309 (6th Cir. 1989) ............................. 24

*Grant v. Mich. Osteopathic Med. Ctr., Inc.*, 172 Mich. App. 536; 432 N.W.2d 313 (1988) ....... 20

*Hartsel v. Keys*, 87 F.3d 795 (6th Cir. 1996) ........................................................... 27

*Hein v. All America Plywood Co.*, 232 F.3d 482 (6th Cir. 2000) ..................................... 20

*Krohn v. Sedgwick James of Mich., Inc.*, 244 Mich. App. 289; 624 N.W.2d 212 (2001) ...... 12, 25

*LaGrant v. Gulf and Western Mfg. Co.*, 748 F.2d 1087 (6th Cir. 1984) ............................. 15

*Lamoria v. Health Care & Retirement Corp.*, 230 Mich. App. 801; 584 N.W.2d 589 (1998), *vacated then reinstated by* 233 Mich. App. 560; 593 N.W.2d 699 (1999) .......... 29

*Lilley v. BTM Corp.*, 958 F.2d 746 (6th Cir. 1992) ................................................ 23, 24

*Logan v. Denny's*, 259 F.3d 558 (6th Cir. 2001).......................................................... 17

*Lytle v. Malady*, 458 Mich. 153; 579 N.W.2d 906 (1998)................................ 14, 15, 21

*Matras v. Amoco Oil Co.*, 424 Mich. 675; 385 N.W.2d 586 (1986) ....................... 14, 15

*McDonald v. Union Camp Corp.*, 898 F.2d 1155 (6th Cir. 1990)....................... 12, 25, 26

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ..................................... 11, 14

*Meagher v. Wayne State Univ.*, 222 Mich. App. 700; 565 N.W.2d 401 (1997).............. 15, 26, 27

*Moore v. KUKA Welding Sys.*, 171 F.3d 1073 (6th Cir. 1999).................................... 16

*Perry v. Harris Chernin*, 126 F.3d 1010 (7th Cir. 1997).......................................... 16

*Phelps v. Yale Sec., Inc.*, 986 F.2d 1020 (6th Cir. 1993).................................... 12, 25

*Preston v. Brendsen Fluid Power*, 125 F.Supp.2d 245 (W.D. Mich. 2000)................ 12

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000) ............................. 11

*Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544 (6th Cir. 1998) ................ 13, 14, 26

*Sahadi v. Reynolds Chem.*, 636 F.2d 1116 (6th Cir. 1980)...................................... 21

*Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121 (6th Cir. 1998) ....................... 16

*Simpson v. Midland-Ross Corp.*, 823 F.2d 937 (6th Cir. 1987) ............................... 24

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998) ........................................ 11

*Smith v. Henderson*, 376 F.3d 529 (6th Cir. 2004) ........................................... 15

*Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106 (8th Cir. 2001)................ 28

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) ...................................... 14, 26

*Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995) ............................. 10

*Town v. Mich. Bell*, 455 Mich. 688; 568 N.W.2d 64 (1997) ................................ 11, 26

*Vagts v. Perry Drug Stores, Inc.*, 204 Mich. App. 481; 516 N.W.2d 102 (1994) ............ 16

*Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510 (6th Cir. 1991)........................ 16

*Wilson v. Wells Aluminum Corp.*, No. 95-2003, 1997 WL 52921 (6th Cir. Feb. 7, 1997)........... 12

*Yates v. Avco Corp.*, 819 F.2d 630 (6th Cir. 1987) ........................................................ 16

**Statutes**

29 U.S.C. § 623(a)(1) ........................................................................................... 11

M.C.L. § 37.2202(1)(a) ........................................................................................ 11

**Rules**

Fed. R. Civ. P. 50 ............................................................................................... 1

## QUESTIONS PRESENTED

1.   Is Defendant Evigna entitled to summary judgment on Plaintiffs' age discrimination claims because there is no evidence that age was a motivating factor in Evigna's decisions to reduce Block-Victor's salary and terminate DaSilva and Nikkila?

     **Evigna Answers: "YES"**

2.   Is Defendant Evigna entitled to summary judgment on Plaintiff Block-Victor's constructive discharge claim because her working conditions were not such that an objectively reasonable person would have felt compelled to quit?

     **Evigna Answers: "YES"**

3.   Is Defendant Evigna entitled to summary judgment on Plaintiff Nikkila's weight discrimination claim because there is no evidence that weight was a motivating factor in Evigna's decision to terminate her position ?

     **Evigna Answers: "YES"**

## I.    INTRODUCTION

On May 10, 2007, Plaintiffs Elaine Block-Victor, Lisa DaSilva, and Kimberly Nikkila (collectively "Plaintiffs") filed suit against their former employer, Defendant CITG Promotions, LLC, d/b/a Evigna ("Evigna"), claiming that they were constructively discharged or terminated because of their ages in violation of the Age Discrimination in Employment Act ("ADEA") and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA").    Nikkila also claims that she was terminated because of her weight in violation of ELCRA.    Because Plaintiffs have failed to produce any evidence, aside from their subjective beliefs, that the actions taken by Evigna were motivated by age or weight, Evigna is entitled to summary judgment on Plaintiffs' claims.

## II.    BACKGROUND

### A.    Evigna Purchases The Failing Business That Employed Plaintiffs

On May 31, 2004, Evigna acquired the promotional marketing division of The Beanstalk Group and inherited Plaintiffs as employees.    When Evigna purchased the business, it was "hemorrhaging three plus million dollars a year."    February 5, 2009 Deposition of Marc Belanski, Vol. I ("Belanski Dep.") at 46:5-6, 57:20-23 (all referenced excerpts attached as **Exhibit A**); October 16, 2008 Deposition of Jeffrey Beckett ("Beckett Dep.") at 23:21-22 (all referenced excerpts attached as **Exhibit B**).    Evigna's investors, however, were attracted to the business because it appeared to have a large client base of Fortune 500 companies.    December 19, 2008 Deposition of Shan Mehta ("Mehta Dep.") at 6:7-23 (all referenced excerpts attached as **Exhibit C**).    This led Evigna's investors to believe that if managed properly, the business could become profitable.    *Id.*

**B.    Evigna Reorganizes Its Sales Force And Develops Cost-Savings Strategies**

A group of investors, led by Shan Mehta and Jeff Beckett, assumed management roles at Evigna and began investigating the business to develop strategies to turn it around. Because neither one had any experience in promotional merchandising, Mehta and Beckett added Marc Belanski, Beanstalk's former Director of Operations, to the management team to help them better understand how the business operated. Belanski Dep. at 31-32. During much of this transitional period, there was no formal organizational structure in place. Rather, Mehta was President, Beckett acted as CEO, and Belanski handled the day-to-day operations of the business and management of the sales force as Executive Vice President of Customer Care.

It was only after the purchase that Evigna's investors discovered that the individual salespersons, and not the company, "owned" the client accounts. Mehta Dep. at 9. Essentially, each individual salesperson operated a business within a business, hiring and supervising her own "team" of sales assistants to service her client accounts. July 8, 2008 Deposition of Elaine Block-Victor ("Block-Victor Dep.") at 23:6-8, 26:1-6, 26:7-27:4, 30:12-17, 31:9-20, 33:13-22 (all referenced excerpts attached as **Exhibit D**). With this kind of business model in place, the company itself essentially had no clients or client contracts and therefore had little value. Belanski Dep. at 101:5-12, 108:4-110:14. Additionally, Evigna was always at risk of losing clients if the salesperson chose to leave the company. Beckett Dep. at 95:12-24.

Management thus developed a corporate-wide initiative "to build enterprise value" and to minimize risk of sales loss by transferring ownership of clients from the individual salespersons to the company. Belanski Dep. at 101:5-12, 108:4-110:14; Beckett Dep. at 95:5-24. Belanski was appointed to lead the effort in transforming the commission sales force into a customer service organization. Mehta Dep. at 17:15-18:9; Beckett Dep. at 96:3-5. As part of this

2

transformation, all salespersons were transitioned from commission-based pay to salaries with opportunities for bonuses. Block-Victor Dep. at 36:11-21, 37:3-21, 38:17-20.

The sales force underwent frequent reorganization as Evigna's corporate-wide initiative developed. During this transitional time there was a lot of confusion surrounding the management of accounts. Belanski Dep. at 149. At the time of the purchase, the sales force had been operating in "teams" of sales assistants organized around the individual salespersons and the accounts they had cultivated. This had resulted in "three or four, possibly even five [levels of account management] in some cases." Belanski Dep. at 223:9-22. In transferring ownership of the accounts brought in by the salespersons to the company, management attempted to eliminate some of this redundancy by assigning primary responsibility for the accounts to many of the sales assistants who had been responsible for the day-to-day servicing of the accounts.

Management also restructured its sales force into vertical teams of salespersons working together to service accounts in certain industries, such as automotive, healthcare, hospitality, etc. September 17, 2008 Deposition of Kimberly Nikkila ("Nikkila Dep.") at 36:9-12, 15-17 (all referenced excerpts attached as **Exhibit E**). As part of this restructuring, management reassigned account responsibilities to members of the respective industry teams. Several salespersons were selected by Belanski to lead these teams and were given Vice President titles with supervisory capacity. This restructuring and account realignment was an ongoing process that continued through 2006. October 13, 2008 Deposition of Barkey Clarke ("Clarke Dep.") at 25:3-27:6 (all referenced excerpts attached as **Exhibit F**).

Many of the salespersons who had been employed by Beanstalk were resistant to these changes and chose to leave the company. Belanski Dep. at 101:13-18.

In addition to reorganizing the sales force, management continually looked for ways to cut costs and increase efficiency. Evigna accomplished this by moving its Detroit area facility, outsourcing certain functions, and eventually reducing staff. *Id.* at 45:4-12, 45:25-46:15. Belanski explained that these cost-cutting measures were implemented company-wide:

> [W]e were hemorrhaging three plus million dollars a year and . . . [and] we needed to eliminate a million dollars in rent expense, we needed to take out a million dollars in professional fees that we were paying for our warehouse and warehouse management systems. Again, it wasn't just isolated to head counts or any one particular area of the company, it was company-wide. We looked at outside offices, telephon[e] expense, IT expenses, product packaging, everything.

*Id.* at 46:3-15.

Because of Evigna's financial condition, "dollars were paramount" and "[s]taffing was looked at every day" throughout 2005 and 2006. *Id.* at 197-98. And in fact, Belanski testified that "[c]ost cutting is still going on today in the organization." *Id.* at 198:23-24.

### C.    Plaintiff Elaine Block-Victor

#### 1.    Block-Victor's Tenure At Evigna

Plaintiff Elaine Block-Victor ("Block-Victor") was a high-ranking salesperson with Beanstalk at the time of its acquisition by Evigna. At Beanstalk, Block-Victor had always received commissions and controlled her own schedule by working from home in the mornings and in the office in the afternoons. Block-Victor Dep. at 27:15-28:2.

After Evigna purchased the business in May of 2004, Block-Victor began reporting directly to Belanski. *Id.* at 42:24-43:15. Block-Victor's primary job responsibilities included managing programs associated with the Lear, UAW, and GM accounts. In May of 2005, Belanski transitioned Block-Victor from commission pay to salary along with the rest of the sales force. *Id.* at 37:3-38:20. At a salary of $175,000 a year, Block-Victor became Evigna's

highest paid salesperson. *Id.* at 37:22-23, 76:10-13. After Block-Victor was transitioned to salary, her job responsibilities remained largely the same and she continued to work from home part-time. *Id.* at 53:12-55:18.

In October of 2005, Beckett approached Block-Victor and offered her the choice of working in the office during normal business hours at full pay or working part-time with part-time pay or working as a consultant. Block-Victor Dep. at 55:19-56:14; Beckett Dep. at 121:16-18. Block-Victor expressed her resistance to changing her customary work schedule to Belanski. October 18, 2005 E-mail from Elaine Block-Victor to Marc Belanski, attached as **Exhibit G**. As a result, Belanski agreed to permit Block-Victor to continue to work from home in the mornings throughout her employment with Evigna. Block-Victor Dep. at 124:20-125:10.

In June of 2006, Barkey Clarke, Block-Victor's newly-appointed sales manager, decided to reduce Block-Victor's salary as part of a company-wide cost savings plan. Clarke Dep. at 48:23-49:3 ("[T]here was a plan and . . . I know the Wisconsin office, the California office, the Florida office, all the offices, and the Texas office, all of those offices were a part of the reduction plan, whether the people were going to be removed or salary reduction...."), 53:3-7; Beckett Dep. at 121:5-8; Mehta Dep. at 38:11-16.

On June 19, 2006, Clarke and Brian Fringer, Evigna's Controller, met with Block-Victor to inform her that her salary would be reduced to $100,000 per year effective July 1 "to align [her] compensation with other Evigna employees who [were] performing similar job functions" and showed her a new organizational chart where her position was listed as a "VPS." Block-Victor Dep. at 106:1-22; Clarke Dep. at 47:17-48:5; June 19, 2006 Letter from Barkey Clarke to Elaine Block-Victor, attached as **Exhibit H**. This salary reduction placed Block-Victor's pay on par with that of her peers, as well as that of Clarke, her superior.

Block-Victor requested time to think about the reduction in salary. Block-Victor Dep. at 107:1-16. Block-Victor then took a medical leave of absence and has since decided not to return to work at Evigna. *Id*. at 110:7-8, 123:8-124:9.

### 2. Block-Victor's "Evidence" Of Age Discrimination

Block-Victor claims that this resignation was involuntary as she was "constructively discharged" because of her age and offers the following as "evidence": (1) she was removed from her position of Regional Vice President of Auto East Division as part of Evigna's reorganization and Tony Schmitt, a then thirty-four-year-old individual, became her supervisor; (2) Jeff Beckett informed her that she would be expected to work at the office during normal business hours or could work either part-time or as a consultant with a salary reduction; (3) Barkey Clarke, her newly-appointed sales manager, asked her what she did at the company and then inquired into her former assistants' responsibilities for servicing the accounts; (4) Block-Victor's salary was reduced to $100,000 per year to align her salary with that of other Evigna employees performing similar job functions; and (5) David Morrison, Executive Vice President of New Business Development, purportedly told DaSilva that Block-Victor "was past her prime" and that she should consider leaving the company.

### D. Plaintiff Lisa DaSilva

### 1. DaSilva's Tenure At Evigna

Like Block-Victor, Plaintiff Lisa DaSilva ("DaSilva") was a salesperson with Beanstalk at the time of the acquisition. July 11, 2008 Deposition of Lisa DaSilva ("DaSilva Dep.") at 21:1-4 (all referenced excerpts attached as **Exhibit I**). At that time, DaSilva primarily had responsibility for the Ford and Oakwood Hospital accounts. *Id*. at 18-23.

In August of 2004, DaSilva agreed to serve as the temporary on-site account representative for Marriott, in Washington, D.C. *Id*. at 21:4-21; July 8, 2004 Evigna Offer Letter

6

of Temporary Assignment to Lisa DaSilva, attached as **Exhibit J**. After her relocation, DaSilva maintained her responsibilities with the Ford account by commuting back to Detroit every ten days. DaSilva Dep. at 21:22-22:7, 26:1-7. After six months, DaSilva began commuting to D.C. every other week, and agreed to temporarily continue in this position for another six months while looking for someone to backfill her position. *Id.* at 24:18-25:9.

In June of 2005, DaSilva requested to be removed from the Ford account, making Marriott the only client for which she had any responsibility. *Id.* at 23:21-24:5, 24:6-9, 27:18-20. That same year, as part of Evigna's reorganization and realignment of accounts, Belanski named DaSilva Vice President of Hospitality Sales. *Id.* at 28:12-23. As such, she took on formal responsibility for Avendra, a company in which Marriott was a majority owner. *Id.*

After DaSilva left her on-site position at Marriott in August of 2005, she found herself "sort of between things," and approached Belanski with the idea of permanently transferring to Evigna's Florida sales office, which needed staffing for the Disney account. *Id.* at 31:3-32:10. He agreed and Evigna offered DaSilva a new position leading the southeast sales region, including the Florida sales office, in October of 2005. *See* October 6, 2005 Evigna Employment Agreement with Lisa DaSilva, attached as **Exhibit K**; DaSilva Dep. at 43:6-9.

While managing the Florida sales office, DaSilva also continued to maintain the Avendra/Marriott accounts. During that time, Avendra expressed dissatisfaction with Evigna's performance of its contractual obligations and requested additional local representation or a new inventory program to better service its needs. DaSilva Dep. at 46-47; Clarke Dep. at 68. Evigna was not able to provide the support Avendra requested and the situation became frustrating for both Avendra and DaSilva.

In June of 2006, Clarke made the decision to remove DaSilva from the Avendra/Marriott accounts and reassign responsibility to Bevin Jacobson. DaSilva Dep. at 87:3-21. Clarke testified that he made the decision to remove DaSilva from the account and replace her with Jacobson based on his judgment that it was in the best interests of the client: "I just felt like [DaSilva] was beaten up from that total experience. I just thought we needed fresh blood, somebody to implement a new plan and move on." Clarke Dep. at 69:21-23. Clarke explained that "[DaSilva] was part of a very negative experience with that customer. The frustration was apparent on both sides. I just felt like we needed a change." Clarke Dep. at 67:8-10. As part of this change, Clarke appointed Jacobson to assume the Vice President of Hospitality Sales position and assigned account responsibility for the Ritz Carlton Club to DaSilva. DaSilva Dep. at 93:15-19.

On August 14, 2006, Evigna terminated DaSilva's position as part of its ongoing cost-savings plan and restructuring of its sales force. Clarke testified that Evigna needed to reduce its payroll by a certain amount and wanted to reach that goal by making as few layoffs as possible. Clarke Dep. at 82:16-83:1. As a result, Clarke selected DaSilva for termination based on "account responsibility and . . . pay amount for job function." *Id.* at 41:1-42:17; 82:11-84:7. Clarke testified that after DaSilva's discharge, Jacobson performed most of DaSilva's job responsibilities in addition to her own, and the rest were "split amongst the people in hospitality." *Id.* at 54:15-24.

### 2.    DaSilva's "Evidence" Of Age Discrimination

DaSilva claims that she was terminated because of her age, and offers the following "evidence" to support her claim: (1) her subjective belief that Evigna had a hiring preference for younger salespersons; (2) Barkey Clarke, DaSilva's sales manager, reassigned DaSilva's responsibilities for the Avendra/Marriott accounts and title of Vice President of Hospitality Sales

to Bevin Jacobson, a then thirty-four-year-old individual; and (3) Jacobson assumed some of DaSilva's account responsibilities after her discharge.

### E.    Plaintiff Kimberly Nikkila

### 1.    Nikkila's Tenure At Evigna

Plaintiff Kimberly Nikkila ("Nikkila") was a salesperson with Beanstalk at the time of the Evigna acquisition.    Nikkila Dep. at 26:15-16, 33:11-20.    Her job responsibilities included researching vendor catalogs for items, providing quotes, entering orders, and data processing for the Oakwood, DaimlerChrysler, Marriott, Avendra, Ford, and Beckman Coulter accounts.    *Id*. at 34-35.    Shortly after the acquisition, Evigna promoted Nikkila to account manager and gave her a raise.    July 19, 2004 Letter from Deanna Tepper to Kim Nikkila, attached as **Exhibit L**.

Nikkila was placed on the hospitality team with DaSilva and her non-hospitality accounts were transferred to others on the respective industry teams as part of Evigna's restructuring. Nikkila Dep. at 36:18-38:16.    As a member of the hospitality team, Nikkila reported directly to DaSilva until June of 2006 when Jacobson became Vice President of Hospitality Sales.

Nikkila testified that as an account manager for the hospitality team, she was assigned to the Avendra/Marriott accounts and her job responsibilities included: (1) handling calls from the six different Marriott properties to provide quotes and ideas regarding merchandise purchases; (2) training the customer service representatives assigned to service the Marriott account; and (3) creating flyers and sending e-mail blasts for the Marriott account.    *Id*. at 56:13-58:18, 59:15-61:10.

As part of Evigna's on-going efforts to restructure, Nikkila was informed on August 14, 2006 that "[her] position was being terminated."    *Id*. at 64:14-17.    Nikkila was selected for termination, along with DaSilva, based on "account responsibility and . . . pay amount for job function."    Clarke Dep. at 41:1-42:17; 82:11-84:7.    Nikkila testified that after her discharge,

Jacobson "handled" and "delegated" Nikkila's former job responsibilities to others on the hospitality team. Nikkila Dep. at 55:14-56:12, 91:20-92:11.

### 2.    Nikkila's "Evidence" Of Age And Weight Discrimination

Nikkila claims that she was terminated because of her age and her weight. Besides her subjective belief that Evigna hired only young, thin salespersons and that she did not fit this perceived "profile," Nikkila offers only isolated, ambiguous remarks made by non-decisionmakers as "evidence" of discrimination. DaSilva testified that Keith Amen, a former sales manager, commented in reference to Nikkila that "they could get other people at less money" and that David Morrison, Executive Vice-President of New Business Development, asked DaSilva if there was something she could do to help Nikkila lose some weight. DaSilva Dep. at 78:6-16, 159:13-161:20.

### III.   **ANALYSIS**

#### A.    **Standard For Summary Judgment**

Summary judgment is appropriate when the Court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment should be granted if the party who bears the burden of proof at trial does not establish an essential element of her case. *See Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995). Accordingly, "[t]he mere existence of a scintilla of evidence in support of [Plaintiffs'] position will be insufficient; there must be evidence on which the jury could reasonably find for [Plaintiffs]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). If the evidence is "merely colorable" and not "significantly probative," the Court must grant summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

**B.    Plaintiffs' Age Discrimination Claims Are Without Merit**

Plaintiffs bring their claims for age discrimination under the ADEA and the ELCRA. Under the ADEA, it is "unlawful for an employer . . . [to] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."   29 U.S.C. § 623(a)(1).    Similarly, Michigan's ELCRA prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age." M.C.L. § 37.2202(1)(a).[1]  Plaintiff Block-Victor claims that she was "constructively discharged" and Plaintiffs DaSilva and Nikkila claim that they were terminated by Defendant because of their age.

Plaintiffs may establish their age discrimination claims by either direct or indirect evidence. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998); *Town v. Mich. Bell*, 455 Mich. 688, 694-95; 568 N.W.2d 64 (1997).  Direct evidence is evidence that, if believed, proves that discrimination was a determining factor in an adverse employment action without relying on any inferences or assumptions. *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007). In the absence of such direct evidence, Plaintiff may demonstrate unlawful discrimination by utilizing circumstantial evidence under the burden-shifting framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Under either approach, the ultimate inquiry is whether age actually motivated the employer's decision. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 146 (2000).

---

[1] Because "the same standards and mode of analysis apply to claims arising under both statutes," and Michigan courts often rely on precedent interpreting federal civil rights laws for guidance in analyzing claims under the ELCRA, Plaintiffs' ADEA and ELCRA age discrimination claims will be addressed together. *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007); *Krohn v. Sedgwick James of Mich., Inc.*, 244 Mich. App. 289, 297 n.4; 624 N.W.2d 212 (2001).

1.    **Plaintiffs have failed to produce any direct evidence of age discrimination**

Plaintiffs have failed to produce any direct evidence of age discrimination. Plaintiffs

Block-Victor and Nikkila will undoubtedly cite the isolated remarks that Morrison and Amen

allegedly made as "evidence" of age discrimination.    To establish direct evidence of

discrimination through comments made in the workplace, however, "the remarks must be 'clear,

pertinent, and directly related to decision-making personnel or processes.'" *Preston v. Brendsen*

*Fluid Power*, 125 F.Supp.2d 245, 250 (W.D. Mich. 2000) (quoting *Wilson v. Wells Aluminum*

*Corp.*, No. 95-2003, 1997 WL 52921, at *5 (6th Cir. Feb. 7, 1997) (attached as **Exhibit M**)).

The statements Plaintiffs cite as evidence of age discrimination were not made by individuals

involved in the adverse employment decisions at issue, nor were any of the alleged statements

"directly related" to those decisions.

Drawing on federal precedent, in *Krohn v. Sedgwick James of Mich., Inc.*, 244 Mich.

App. 289; 624 N.W.2d 212 (2001), the Michigan Court of Appeals enumerated four factors that

courts should review to determine the relevance of such remarks to discrimination claims:

> (1) Were the disputed remarks made by the decisionmaker or by an
> agent of the employer uninvolved in the challenged decision? (2)
> Were the disputed remarks isolated or part of a pattern of biased
> comments? (3)  Were the disputed remarks made close in time or
> remote from the challenged decision?   (4)   Were the disputed
> remarks ambiguous or clearly reflective of discriminatory bias?

*Id.* at 292-97 (citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994); *Phelps v.*

*Yale Sec., Inc.*, 986 F.2d 1020 (6th Cir. 1993); *McDonald v. Union Camp Corp.*, 898 F.2d 1155

(6th Cir. 1990)).

Here, the isolated statement that Block-Victor relies on as evidence that she was

discriminated against because of her age was made by someone who was uninvolved in the

decision to reduce her salary.  Block-Victor testified that Morrison allegedly told DaSilva that

Block-Victor "was past [her] prime" and that she should consider leaving the company. Block-Victor Dep. at 59:6-14, 93:5-94:16. It is undisputed, however, that as Executive Vice President of New Business Development, Morrison did not have any supervisory authority over Block-Victor and that he played no role in the decision to reduce her salary. In fact, DaSilva testified that "[Morrison] wasn't a decision-maker." DaSilva Dep. at 76:21-25. Accordingly, this alleged remark cannot serve as direct evidence of discriminatory intent. *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 1998) ("[S]tatements by non-decision makers, or statements by decision makers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden of demonstrating animus." (citations omitted)).

Likewise, the stray remark that Amen allegedly made to DaSilva in reference to Nikkila that "they could get other people at less money" is not direct evidence of age discrimination. *See* DaSilva Dep. at 159:13-161:16. This ambiguous comment cannot serve as direct evidence as it requires an inference to establish that it was made because of Nikkila's age. *See id.* at 161:13-20 (testifying that Amen used the word "other" not "younger" to describe who they could get to perform Nikkila's duties and it was "an assumption it would be younger"). Furthermore, the remark was made in reference to Nikkila's request for a raise when taking on additional responsibilities with the Ritz Carlton account and was thus unrelated to the later decision to terminate her position. *Id.* at 159:13-161:9; Nikkila Dep. at 85:17-86:5. Accordingly, "because the ambiguous and isolated remark had nothing to do with the termination of [Nikkila's] employment and was made by a *former* supervisor remote in time from when [Nikkila's] employment was terminated," it is not evidence of discriminatory intent. *Krohn*, 244 Mich. App. at 303 (emphasis added).

Therefore, Plaintiffs have failed to support their claims with direct evidence of age discrimination.

**2.    Plaintiffs have failed to establish a *prima facie* case of age discrimination under the *McDonnell Douglas* framework**

Plaintiffs have also failed to set forth indirect evidence sufficient to support an inference of discriminatory intent on the part of Evigna.   Under the *McDonnell Douglas* burden-shifting framework, Plaintiffs have the initial burden of proving a *prima facie* case by establishing that they each suffered an adverse employment action under circumstances giving rise to an inference of age discrimination.  *See Rowan*, 360 F.3d at 547; *Dubey v. Stroh Brewery Co.*, 185 Mich. App. 561, 563; 462 N.W.2d 758 (1990).  If Plaintiffs succeed in establishing a *prima facie* case, the burden of production shifts to Evigna to articulate some legitimate reason for its actions, "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action."  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993).  Plaintiffs must then prove that the legitimate reason set forth by Evigna was a mere pretext for age discrimination.  *Rowan*, 360 F.3d at 547; *Lytle v. Malady*, 458 Mich. 153, 174; 579 N.W.2d 906 (1998) ("*Lytle II*").

To establish a *prima facie* case of age discrimination, Plaintiffs must prove that they were: (1) members of a protected class; (2) qualified for their positions; and (3) subjected to an adverse employment action; (4) under circumstances giving rise to an inference of discrimination.  *See Rowan*, 360 F.3d at 547; *Matras v. Amoco Oil Co.*, 424 Mich. 675, 683-84; 385 N.W.2d 586 (1986).

Furthermore, when, as here, Plaintiffs DaSilva and Nikkila were discharged in connection with a reduction in force,[2] they bear a "greater burden of proof" in establishing claims of age discrimination. *See Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1464-65 (6th Cir. 1990); *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 717; 565 N.W.2d 401 (1997). This is because "[t]he mere termination of [ ] competent employee[s] when an employer is making cutbacks due to economic necessity is insufficient to [raise the presumption of age discrimination necessary to] establish a prima facie case." *LaGrant v. Gulf and Western Mfg. Co.*, 748 F.2d 1087, 1090 (6th Cir. 1984). Accordingly, under such circumstances, Plaintiffs must present "additional direct, circumstantial, or statistical evidence tending to indicate that [Evigna] *singled out* [Plaintiffs] for discharge for impermissible reasons." *Barnes*, 896 F.2d 1465 (emphasis added); *Matras*, 424 Mich. at 684.

### a)    Plaintiff Block-Victor cannot establish that she was constructively discharged

The only adverse employment action Block-Victor was subjected to was the reduction of her pay in June of 2006. Unlike DaSilva and Nikkila, Block-Victor chose to resign from Evigna of her own accord. Block-Victor claims, however, that this resignation was involuntary because Evigna deliberately created "intolerable working conditions" with the intention of forcing her to quit, resulting in her "constructive discharge" because of her age. Complaint at ¶ 25-27; *see Smith v. Henderson*, 376 F.3d 529, 533-34 (6th Cir. 2004) (holding a voluntary resignation that amounts to a constructive discharge may be an adverse employment action). This claim is without merit.

---

[2] It is clear that Plaintiffs DaSilva and Nikkila were discharged as part of a reduction in force as courts have repeatedly found that the key to determining if a company has engaged in a valid work force reduction is whether the discharged employee was "replaced." *Barnes*, 896 F.2d at 1465; *Lytle II*, 458 Mich. at 177-78 n.27. The elimination of their positions is discussed fully in III(B)(2)(a)(3), *infra*.

A constructive discharge is established where "an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation or, stated differently, when working conditions become so difficult or unpleasant that a reasonable person would feel compelled to resign." *Vagts v. Perry Drug Stores*, 204 Mich. App. 481, 487; 516 N.W.2d 102 (1994); *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1127 (6th Cir. 1998); *Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir. 1987).

The employee's perception that she was forced to resign, however, must be judged objectively. *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991). Thus, proof of the claim requires both deliberate intent by the employer and an objective standard for assessing the intolerability of the working conditions alleged:

> [T]he employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined. Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions.

*Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

The constructive discharge doctrine recognizes that society is best served if "wherever possible unlawful discrimination is attacked within the context of existing employment relationships." *Coffman v. Tracker Marine, LP*, 141 F.3d 1241, 1247 (8th Cir. 1998); *Borque v. Powell Electrical Mfg. Co.*, 617 F.2d 61 (5th Cir. 1980). Thus, unless the working conditions are "beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress." *Perry v. Harris Chernin*, 126 F.3d 1010, 1015 (7th Cir. 1997).

Here, Block-Victor cannot prove either element required to establish that she was constructively discharged. Although Block-Victor claims that she found her working conditions intolerable, she cannot show that her working conditions were so oppressive that an objectively

reasonable person would have felt compelled to quit.  This Court considers the presence of the following factors to determine whether the employer created working conditions that a reasonable person would find intolerable:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's*, 259 F.3d 558, 569 (6th Cir. 2001) (quoting and adopting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

Block-Victor claims that the following incidents created intolerable working conditions that forced her to resign:  (1) in October of 2005, she saw a new organizational chart that no longer designated her as Vice President of Auto East Division; (2) in October of 2005, Jeff Beckett informed her that she would be expected to work at the office during normal business hours or could work either part-time or as a consultant with a salary reduction; (3) in March of 2006, Barkey Clarke, her newly-appointed sales manager, asked her what she did at the company and inquired into her former assistants' responsibilities for servicing the programs; and (4) in June of 2006, Block-Victor's salary was reduced to $100,000 per year to align her salary with that of other Evigna employees performing similar job functions.

An objectively reasonable person, however, would not have felt she had no choice but to resign because of these incidents.  Here, Block-Victor testified that after she was shown the new organizational chart that no longer listed her title as Vice President of Auto East Division, her job responsibilities remained the same and she continued to supervise her direct reports.  Block-Victor Dep. at 85:13-22, 146:21-24.  Block-Victor also testified that when she was informed that her salary would be reduced, she was shown a different organizational chart that listed her title as

"VPS" – a Vice President of Sales position.  *Id.* at 146:25-147:12.  Moreover, despite her conversation with Beckett, it is undisputed that the terms and conditions of Block-Victor's employment remained unchanged as she was permitted to continue to work from home part-time throughout her employment at Evigna.  And, although Block-Victor personally felt that the conversation she had with Clarke was "hostile," an objectively reasonable person would not find questions posed by a newly-appointed manager to his subordinate regarding her job function to be harassment calculated to encourage her to resign.  Therefore, neither the new organizational chart nor Block-Victor's conversations with Beckett or Clarke created intolerable working conditions.

Furthermore, although Block-Victor experienced a reduction in salary to align her pay with that of other Evigna employees performing similar job functions, a reasonable person in Block-Victor's position would not find this to be so intolerable in light of the fact that even after Evigna reduced her salary to $100,000 per year, Block-Victor was still one of Evigna's highest paid salespersons, and her salary matched that of her sales manager, Clarke, the Executive Vice-President of Sales.[3]  Clarke Dep. at 10:10-18; *see* **Exhibit H**.  In fact, Block-Victor's reduced salary also exceeded that of Tony Schmitt, the younger individual who she alleges became her supervisor and who she mistakenly claims "replaced" her.  *See* Excerpt of 2005-2006 Evigna Wage Audit Charts, attached as **Exhibit N** (Schmitt's 2005 regular wages were approximately $57,000 and his 2006 regular wages were approximately $85,000).  In light of these circumstances, a reasonable person in Block-Victor's shoes would not have felt compelled to quit because of the reduction of her pay.  And, in fact, Block-Victor herself did not feel forced to resign, as evidenced by the fact that she did not make the decision that she would not return to

---

[3] The record evidence reflects that Clarke, Block-Victor's superior, only received a salary of $105,000 a year.  Clarke Dep. at 10:10-18.

Evigna until the spring of 2007, almost a year after her salary had been reduced. Block-Victor Dep. at 123:8-19.

But even assuming *arguendo* that an objectively reasonable person would have found this pay cut to be intolerable, Block-Victor must still prove that Evigna reduced her salary with the *intention* of forcing her to quit to establish that she was constructively discharged. Block-Victor has presented no evidence that Evigna so intended. To the contrary, the record evidence reflects that Evigna desired to retain Block-Victor as it made the decision to reduce her salary while eliminating other employees' positions due to economic necessity. Clarke Dep. at 48:23-49:3.

Accordingly, as Block-Victor has failed to establish that Evigna deliberately created objectively intolerable working conditions for Block-Victor with the intention of forcing her to quit, Block-Victor cannot establish that she was constructively discharged. Thus, the only adverse employment action Block-Victor was subjected to was the reduction of her salary.

Most importantly, though, even if Block-Victor could establish that her salary reduction amounted to a constructive discharge, because a "[c]onstructive discharge is not in itself a cause of action," *Vagts*, 204 Mich. App. at 487, Block-Victor must still present evidence that her salary was reduced *because of her age* to state a viable claim. Block-Victor has presented no such evidence. *See* discussion *infra* at III(B)(2)(b)-(d).

### b) Plaintiffs have failed to present evidence sufficient to warrant an inference of age discrimination

Plaintiffs cannot establish a *prima facie* case as they have failed to present evidence sufficient to warrant an inference that age was a motivating factor in Evigna's decisions to reduce Block-Victor's salary and terminate DaSilva and Nikkila. Besides their subjective beliefs and conclusory allegations that Evigna had a preference for hiring younger salespersons and that the adverse decisions at issue were made because Plaintiffs did not fit this "profile," Plaintiffs'

"evidence" of discriminatory intent is limited to the following: (1) Block-Victor's title of regional Vice President of Auto East Division was eliminated as part of Evigna's reorganization and Tony Schmitt, a then thirty-four-year-old individual, became Vice President of Automotive Sales; (2) after DaSilva's and Nikkila's positions were eliminated, Evigna employee Bevin Jacobson, a then thirty-four-year-old individual, assumed some of the account responsibilities formerly handled by DaSilva and Nikkila; (3) statements purportedly made by David Morrison, Executive Vice President of New Business Development, that Block-Victor "was past her prime" and that she should consider leaving the company; and (4) a remark allegedly made by Keith Amen, a former sales manager, in reference to Nikkila that "they could get other people at less money."

### (1) Plaintiffs' subjective beliefs cannot support an inference of discriminatory intent

Plaintiffs allege that Block-Victor's pay was reduced in an effort to force her to resign and DaSilva and Nikkila were terminated because they did not fit what they perceived to be the young "image" Evigna wished its sales force to portray. To support this claim, Plaintiffs offer only conclusory testimony about "rumors" that Evigna wanted to replace all the older salespersons with younger salespersons and their perceptions that Evigna was hiring a lot of younger employees and that they did not fit this "profile." DaSilva Dep. at 57. Plaintiffs' "evidence" of discrimination thus amounts to no more than hunches and suppositions. "Mere personal beliefs, conjecture and speculation[, however,] are insufficient to support an inference of age discrimination." *Chappell v. GTE Prod. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) (citation omitted); *see also Hein v. All America Plywood Co.*, 232 F.3d 482, 488-89 (6th Cir. 2000); *Grant v. Mich. Osteopathic Med. Ctr., Inc.*, 172 Mich. App. 536, 539-40; 432 N.W.2d 313 (1988) (finding that employee's "naked assertions" are insufficient to support a claim of age

discrimination).  Accordingly, Plaintiffs cannot establish a *prima facie* case of age discrimination as their subjective beliefs cannot support the requisite inference of discriminatory intent.

### (2)     Plaintiff Block-Victor was not replaced by a younger individual

Plaintiff Block-Victor's claim that she was removed from her position as Vice President of Auto East Division and "replaced" by Tony Schmitt, a then thirty-four-year-old individual is without merit.  Complaint at ¶ 19; Block-Victor Dep. at 83:15-18.  To support this claim, Block-Victor alleges that she was shown a new organizational chart in October of 2005 that listed Tony Schmitt as Vice President of Sales and Block-Victor in some other position other than Vice President of Auto East Division.  Block-Victor Dep. at 89:18-25.  The undisputed evidence, however, reveals that Tony Schmitt did not replace Block-Victor as Vice President of Auto East Division; rather, as part of a company-wide reorganization, including changes in titles and elimination of the regional Vice President positions, Schmitt was promoted to a position beyond Block-Victor's as Vice President of Sales with responsibility for the entire automotive group.  *Id.* at 85:9-12, 144:23-146:3; January 18, 2006 Evigna Sales Organizational Chart, attached as **Exhibit O**.  The law is clear that a person "is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties."  *Barnes*, 896 F.2d at 1465; *see also Sahadi v. Reynolds Chem.*, 636 F.2d 1116 (6th Cir. 1980); *Lytle II*, 458 Mich. at 177-78 n.27.  Accordingly, because Schmitt's new duties as Vice President of Sales were broader than Block-Victor's duties as Vice President of Auto East Division, Schmitt did not "replace" Block-Victor.[4]

---

[4] Furthermore, it is not even clear that Block-Victor's job responsibilities changed at all after Schmitt was promoted as she testified that she continued to supervise her direct reports.  Block-Victor Dep. at 85:13-22, 146:21-24.

>        (3)    **Plaintiffs DaSilva and Nikkila were never replaced, as their duties were divided among several individuals as part of a corporate reorganization plan**

Plaintiffs DaSilva's and Nikkila's assertions that they were "replaced" by a younger individual, Bevin Jacobson, are also without merit. Complaint at ¶¶ 46-47, 59; DaSilva Dep. at 86:18-23; Nikkila Dep. at 55:12-15. In fact, that both Plaintiffs testified that the *same* individual "replaced" them alone defeats this claim.

DaSilva and Nikkila were terminated as part of a reduction in force. "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Barnes*, 896 F.2d at 1465. An employee, however, is not terminated as part of a reduction in force if she is "replaced" after her discharge. *Id.* A person is not "replaced" if another employee is assigned the plaintiff's duties in addition to other responsibilities, or when the work is redistributed among other existing employees. *Id.* The key inquiry here is whether Plaintiffs' terminations "resulted in the elimination of [two] employment position[s] and accomplished cost savings for [Evigna], the goal of any RIF." *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 895 (6th Cir. 1997).

Here, Evigna terminated DaSilva's and Nikkila's positions as part of its ongoing cost-savings plan and restructuring of the sales force. Evigna needed to reduce its payroll by a certain amount and wanted to reach that goal by making as few layoffs as possible. Clarke Dep. at 82:16-83:1. As a result, Clarke selected DaSilva and Nikkila for termination based on "account responsibility and . . . pay amount for job function." *Id.* at 41:1-42:17; 82:11-84:7. In fact, Clarke testified that "[n]obody had to volunteer" their names for termination as the choice became "glaring[ly]" obvious after analyzing this data. *Id.* at 84:1-7; 86:8-20.

22

DaSilva testified that at the time of her discharge she was a senior account manager for the hospitality team, reporting to Jacobson, with responsibility for managing the properties with the Ritz Carlton account. DaSilva Dep. at 87:10-19, 93:10-22, 102:22-24. Nikkila testified at the time of her discharge she was an account manager for the hospitality team, reporting to Jacobson, and her duties included: (1) handling calls from the six different Marriott properties to provide quotes and ideas regarding merchandise purchases; (2) training the customer service representatives assigned to service the Marriott account; and (3) creating flyers and sending e-mail blasts for the Marriott account. Nikkila Dep. at 56:13-58:18, 59:15-61:10.

After they were terminated, DaSilva's and Nikkila's former account responsibilities were re-distributed to other members of the hospitality team to perform in addition to their regular duties. Clarke Dep. at 54:15-24. In fact, Nikkila admitted that after she was terminated, Jacobson "handled" and "delegated" Nikkila's former duties answering the calls and managing the programs for the Marriott account to others on the hospitality team. Nikkila Dep. at 55:14-56:12, 91:20-92:11. Furthermore, Nikkila testified that she believed Jacobson had replaced both her and DaSilva and "apparently" performed "all three jobs." *Id.* at 56:8-12. Because DaSilva's and Nikkila's responsibilities were delegated to others to perform in addition to their own duties, the record in this matter fully demonstrates that Plaintiffs were *not* replaced. *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."). Instead, DaSilva's and Nikkila's terminations "resulted in the elimination of [two] employment position[s] and accomplished cost savings for [Evigna], the goal of any RIF." *Brocklehurst*, 123 F.3d at 895. Plaintiffs' wholly subjective and conclusory allegations, without more, are insufficient to establish the contrary.

Furthermore, to the extent that DaSilva and Nikkila attempt to argue that they were replaced because Evigna hired Dayl Soll to work in the Florida sales office in April of the following year, this claim is meritless.[5] "The fact that [eight] months later business had picked up to the extent that another employee was needed in the sales department does not mean that [Soll] replaced [Nikkila or DaSilva] in any sense relevant to inferring age-based discrimination." *Lilley*, 958 F.2d at 752; *see also Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 941 (6th Cir. 1987) (finding *three*-month interval "substantially weaken[s]" any inference).

Additionally, Soll testified that she did not replace anyone as she was hired into a "newly created position," which focused on developing new business for the Disney account. January 20, 2009 Deposition of Dayl Soll ("Soll Dep.") at 7:1-11, 14:8-17, 48:2-7 (all referenced excerpts attached as **Exhibit P**).

As Plaintiffs DaSilva and Nikkila were never "replaced" by younger individuals, there can be no inference of discriminatory intent. Accordingly, they have failed to establish a *prima face* case of age discrimination.

> **(4)    The alleged statements of Morrison and Amen are irrelevant and too isolated and ambiguous to constitute evidence of discriminatory intent**

Finally, the alleged remarks which form the basis of Plaintiffs' age discrimination claims do not give rise to an inference of discriminatory intent. First, the remarks were isolated. *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309 (6th Cir. 1989) (holding supervisor's solitary remark that he "need younger blood" was insufficient to support inference of discriminatory intent).

---

[5] In any event, even if Soll replaced DaSilva or Nikkila (which she did not), this replacement would not give rise to an inference of age discrimination as Soll, who is sixty-one, is *older* than both DaSilva and Nikkila. This fact also contradicts Plaintiffs' claims that they were terminated because they did not fit the young "image" Evigna allegedly wished to portray as Soll was hired by Evigna at the age of fifty-nine. Soll Dep. at 11:5-8, 4:18-22.

Second, it is undisputed that neither Morrison nor Amen, the Evigna employees who allegedly made the statements, had any involvement in the decisions to reduce Block-Victor's salary or terminate Nikkila's employment. *See McDonald*, 898 F.2d at 1161-62 & n.3; *Krohn*, 244 Mich. at 218 (holding remark made by the plaintiff's former supervisor could not be attributed to the employer). Third, Morrison's comment about Block-Victor being "past her prime" was allegedly made to DaSilva in November of 2005 and the decision to reduce Block-Victor's salary was not made until June of 2006, more than seven months later. *See Phelps*, 986 F.2d at 1025-26 (finding remarks made eight months prior to the layoff decision were too remote to have influenced the decision). And finally, Amen's alleged remark that "they could get *other* people at less money" in reference to Nikkila is too ambiguous to establish the necessary inference of age discrimination. *McDonald*, 898 F.2d at 1161-62 & n.3 (holding comment by person other than the decisionmaker that "a senior salesman at age 55 'could be cheaply replaced with a younger salesman'" does not raise an issue of material fact regarding the employer's motives). Accordingly, these stray remarks made by non-decisionmakers do not constitute evidence of discriminatory intent on the part of Evigna.

Because Plaintiffs have failed to present evidence demonstrating that Block-Victor's salary was reduced and DaSilva and Nikkila were terminated under circumstances giving rise to an inference of discriminatory intent, they cannot establish a *prima facie* case of age discrimination, and their claims are properly dismissed.

c) **Even assuming *arguendo* that Plaintiffs can make out a *prima face* case, Evigna has articulated a legitimate, non-discriminatory reason for its actions**

Furthermore, even assuming *arguendo* that Plaintiffs can establish a *prima facie* claim of age discrimination, Evigna has articulated legitimate, nondiscriminatory reasons for its decisions to reduce Block-Victor's salary and terminate DaSilva and Nikkila. These decisions were made

25

as part of Evigna's cost-savings goals and reorganization of its sales force. Block-Victor's salary was reduced to $100,000 per year to align her compensation with that of other Evigna employees performing similar job functions. *See* **Exhibit H**. And DaSilva and Nikkila were discharged as part of a reduction in force. *See Town*, 455 Mich. at 703 ("A layoff in the context of an overall workforce reduction provides a nondiscriminatory explanation for the plaintiff's discharge."). Since Evigna has produced evidence of nondiscriminatory reasons for its actions, any legal presumption of discrimination "evaporates." *McDonald*, 898 F.2d at 1160.

> **d)      Plaintiffs have failed to establish that Evigna's articulated reasons were pretextual**

Once Evigna provides legitimate, nondiscriminatory reasons for its decisions, Plaintiffs must prove by a preponderance of the evidence that the reasons offered by Evigna were a pretext designed to mask age discrimination to survive summary judgment of their claims. *Rowan*, 360 F.3d at 547; *Meagher*, 222 Mich. App. at 711. Accordingly, Plaintiffs must prove pretext by showing that the stated reasons were not the true reasons and that instead their ages were motivating factors in Evigna's decisions. *Town*, 455 Mich. at 696. Plaintiffs cannot create a genuine issue of fact by merely rebutting Evigna's stated reasons; "that there may be a triable question of falsity does not necessarily mean there is a triable question of discrimination." *Id.* at 698. Indeed, "[a] reason cannot be proved to be 'a pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's*, 502 U.S. at 525 (emphasis in original).

Plaintiffs cannot establish pretext as they have failed to present any evidence demonstrating that Evigna's stated cost-savings reasons for its decisions had no basis in fact, let alone that age was a motivating factor in the decisions. The record evidence reflects that the business was "hemorrhaging three plus million dollars a year" and Evigna made the difficult

decision to reduce salaries and eliminate positions in its efforts to cut costs and increase efficiency. Belanski Dep. at 46:5-6, 57:20-23. Block-Victor's salary was reduced because her $175,000 per year salary was considerably out of line with the salaries of those she considered to be her peers. *See* **Exhibits H** and **N**; Block-Victor Dep. at 114:2-21; Clarke Dep. at 50:15-24 (In June of 2006, "Liz Stollmer, Lisa DaSilva, Bevin Jacobson, Tony Schmidt [sic], Dan Steinberg, and then the two guys in California" were Block-Victor's "peers"). And DaSilva's and Nikkila's positions were selected for elimination based on "account responsibility and . . . pay amount for job function." Clarke Dep. at 41:1-42:17; 82:11-84:7. Because at that time DaSilva only had responsibility for the Ritz Carlton Club and Nikkila only had responsibility for Marriott/Avendra, "[n]obody had to volunteer" their names for termination as the choice became "glaring[ly]" obvious. Clarke Dep. at 84:1-7; 86:8-20. In fact, DaSilva herself testified that "[Nikkila] wasn't in a strong sales position. So, she would have been easily dispensable from the get-go." DaSilva Dep. at 79:6-9. Thus, Plaintiffs cannot establish pretext as they have presented no evidence demonstrating that Evigna's reasons for Block-Victor's reduction in salary and DaSilva's and Nikkila's terminations had no basis in fact or were insufficient to justify the actions taken.

More importantly, though, Plaintiffs cannot establish pretext as they have failed to proffer evidence that age discrimination was the real reason for Evigna's decisions. Although DaSilva questions the wisdom of Clarke's decision to remove her from the Avendra/Marriott accounts and transfer responsibility to Jacobson, a younger individual, "the soundness of an employer's business judgment may not be questioned as a means of showing pretext" because the issue is not whether the decision was wrong or mistaken but whether the decision was discriminatory. *Meagher*, 222 Mich. App. at 712; *see also Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996)

("The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with.").[6] Clarke testified that he made this decision based on what he believed to be best for the client. Clarke explained that "[DaSilva] was part of a very negative experience with that customer. The frustration was apparent on both sides. I just felt like we needed a change." Clarke Dep. at 67:8-10. Thus, DaSilva's disagreement with the wisdom of Clarke's decision to remove her from the Avendra/Marriott accounts is not evidence of pretext absent some indication that Clarke made this decision based on age.

Additionally, any conclusory testimony regarding Evigna's alleged preference for younger employees cannot be deemed evidence of pretext because there is no evidence that Belanski and Clarke, the decision-makers in the adverse employment actions at issue, harbored such a belief. *Felder v. Nortel Networks Corp.*, No. 05-5250, 2006 WL 1889275, at *8 (6th Cir. July 10, 2006) (attached as **Exhibit Q**) ("Plaintiff's conclusory allegations about the "white culture" at Nortel cannot be imputed to Nortel's decision-makers in the disputed hiring decision absent some specific evidence of racial animus on the part of the actual decision-makers."). Similarly, the alleged remarks made by Morrison and Amen cannot be considered evidence of pretext because it is undisputed that they were not involved in any way in the decisions to reduce Block-Victor's salary or to terminate DaSilva and Nikkila.

As Plaintiffs have not proffered any evidence raising a viable issue of fact as to whether Evigna's proffered reasons for its decisions to reduce Block-Victor's salary and discharge DaSilva and Nikkila were a pretext designed to mask age discrimination, Plaintiffs' claims must be dismissed.

---

[6] *Dabrowski v. Werner-Lambert*, 815 F.2d 1076, 1080 (6th Cir. 1987) (Evidence of an "unwise choice" is insufficient to prove discrimination); *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1112 (8th Cir. 2001) ("[R]eliance on an honest yet incorrect belief is not evidence of pretext.").

**C.     Plaintiff Nikkila's Weight Discrimination Claim Is Also Without Merit**

Plaintiff Nikkila also claims that she was terminated because of her weight in violation of ELCRA. Nikkila is 5'6" and weighed 170 lbs. at the time of her termination. Nikkila Dep. at 78:4-7, 21-23. To establish a weight discrimination claim, Nikkila must prove that weight was a "determining factor" in Evigna's decision to discharge her. *Lamoria v. Health Care & Retirement Corp.*, 230 Mich. App. 801, 808-09; 584 N.W.2d 589 (1998), *vacated then reinstated by* 233 Mich. App. 560; 593 N.W.2d 699 (1999). Like her age discrimination claim, Nikkila may establish the requisite discriminatory animus because of her weight through either direct evidence or circumstantial evidence. *Figgins v. Advance America Cash Advance Centers of Mich., Inc.*, 476 F.Supp.2d 675, 686 (E.D. Mich. 2007) (citing *Lamoria*, 230 Mich. at 807).

Here, Nikkila admits that no one ever made any comments to her about her weight. Nikkila Dep. at 77:2-5. She also acknowledges that, contrary to her assertion that Evigna only hired young, thin people, "Barkey [Clarke] was hired during that time and he wasn't thin." *Id.* at 79:9-14. The only "evidence" Nikkila presents to support her claim that she was terminated because of her weight is a remark allegedly made by Morrison to DaSilva asking her if there was something she could do to help Nikkila lose some weight. *Id.* at 76:23-77:1; DaSilva Dep. at 78:6-16. Although Morrison recalls discussing Nikkila's weight with DaSilva, he testified that "[he] didn't discuss Kim Nikkila's weight relative to her job." September 26, 2008 Deposition of David Morrison ("Morrison Dep.") at 45:3-6 (all referenced excerpts attached as **Exhibit R**).

Regardless, this isolated and ambiguous[7] remark cannot serve as direct or circumstantial evidence of discriminatory intent because it is undisputed that it was allegedly made by a non-

---

[7] As the Michigan Court of Appeals cautioned in *Lamoria*, because being overweight, unlike race or sex, is a health-related condition, "comments that could be reasonably taken as mere
Footnote continued on next page …

decisionmaker with no supervisory authority over Nikkila. *See Figgins*, 476 F.Supp.2d at 686 (holding isolated and ambiguous remarks become relevant only when made by an individual with decision-making authority); Morrison Dep. at 43:4-17 (testifying that he knew Nikkila was at risk for termination only because he likely overheard it by virtue of sharing an office and that it "wouldn't matter if [he] knew about it or if [he] gave them a comment on it"); DaSilva Dep. at 76:21-25. There is absolutely no evidence that any decision-maker shared Morrison's views regarding Nikkila's weight. Furthermore, DaSilva's "feeling[s]" and "assumption[s]" that Morrison "was parroting something he had heard" are insufficient to establish otherwise. DaSilva Dep. at 78:22-23, 79:16-80:8. Thus, regardless of the questions surrounding whether this remark was ever made, and in what context, this alleged statement is too isolated and ambiguous to constitute evidence of discriminatory intent. *Krohn*, 244 Mich. App. at 300.

Even if this evidence were sufficient to establish a *prima facie* case under the *McDonnell Douglas* burden-shifting framework (which it is not), Nikkila cannot establish that Evigna's articulated reason for her discharge – that her position was selected for elimination as part of a reduction in force based on "account responsibility and . . . pay amount for job function" – was a pretext designed to mask weight discrimination. *See* discussion *supra* at III(B)(2)(b)-(c). To the contrary, DaSilva confirmed the legitimacy of Evigna's stated reasons for Nikkila's discharge, stating that Nikkila "would have been easily dispensable from the get-go" because "[Nikkila] wasn't in a strong sales position." DaSilva Dep. at 79:6-9. And Morrison testified that his conversations with DaSilva about Nikkila being at risk for termination focused on "trying to figure out a way to get her into a more strategic position which would make her someone that had enough business or a channel of responsibility that they would keep her." Morrison Dep. at

---

Footnote continued from previous page ...

advice about diets and the like do not amount to expressions of animus sufficient to indicate a likelihood that one would engage in illegal weight discrimination." 230 Mich. App. at 810 n.8.

44:1-9. Thus, Nikkila has failed to rebut Evigna's legitimate reason for her termination, and more importantly, has failed to present any evidence indicating that weight discrimination was the real reason.

Given that Plaintiff Nikkila has failed to produce evidence demonstrating that weight was a determining factor in her discharge, this Court should grant Evigna judgment on her weight discrimination claim as well.

## IV.    **CONCLUSION**

For these reasons, Defendant respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiffs' Complaint with prejudice.

Respectfully Submitted,

DICKINSON WRIGHT PLLC

By:____s/Allyson A. Miller_____
   Timothy H. Howlett (P24030)
   Allyson A. Miller (P71095)
   Dickinson Wright PLLC
   Counsel for Defendants
   500 Woodward Avenue, Suite 4000
   Detroit, Michigan  48226
   (313) 223-3500
   amiller@dickinsonwright.com

Dated:  March 2, 2009

I hereby certify that on March 2, 2009, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

s/Allyson A. Miller (P71095)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
(313) 223-3500
amiller@dickinsonwright.com

DETROIT 28475-4 1077747v3