UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELAINE BLOCK-VICTOR, LISA DaSILVA,
and KIMBERLY NIKKILA,

                Plaintiffs,

                                          Case No. 07-CV-12055

vs.                                     HON. GEORGE CARAM STEEH

CITG PROMOTIONS, L.L.C. d/b/a
EVIGNA,

                Defendant.

_____/

<u>ORDER GRANTING, IN PART,</u>
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (# 18)</u>

      Defendant CITG Promotions, L.L.C. d/b/a Evigna moves for summary judgment of

plaintiffs Elaine Block-Victor's, Lisa DaSilva's, and Kimberly Nikkila's claims of age

discrimination in violation of the federal Age Discrimination in Employment Act ("ADEA"),

29 U.S.C. §§ 621 <u>et</u> <u>seq</u>., and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), §§

37.2101 <u>et</u> <u>seq</u>., as well as Nikkila's claim of weight discrimination in violation of the

ELCRA.  A hearing was held on July 7, 2009.  For the reasons set forth below, Evigna's

motion for summary judgment will be granted, in part, as to DaSilva's and Nikkila's ADEA.

DaSilva's and Nikkila's ELCRA claims will be dismissed, without prejudice, with the court

declining to exercise supplemental jurisdiction over these state law ELCRA claims.

Evigna's motion for summary judgment will be denied, in part, as to Block-Victor's ADEA

and ELCRA claims.

## I. Background

      Plaintiffs filed their complaint in federal court on May 10, 2007 alleging that Block-

Victor was constructively discharged from Evigna on June 19, 2006, and that DaSilva, and Nikkila were terminated from Evigna on August 14, 2006, pursuant to Evigna's pattern and practice of favoring younger employees.  Plaintiffs each allege that they were replaced by substantially younger employees.  Nikkila alleges she was also terminated because of her weight.

Evigna purchased the promotional marketing division of Beanstalk on May 24, 2004. Prior to the purchase by Evigna, Beanstalk was losing approximately $ 3.0 million per year. Part of Evigna's motivation for purchasing Beanstalk was its client base.  Evigna inherited seventy-two Beanstalk Sales Department employees, including Block-Victor, DaSilva, and Nikkila.  By mid-2005, Evigna experienced a modest profit.  On May 1, 2005, Evigna moved all of its sales employees from a commission-based pay to salary.

## II. Plaintiffs' Allegations and Argument

### A. Plaintiff Block-Victor

On May 1, 2005, Evigna took Block-Victor off commissions and her title was changed from an Executive Vice President position to Regional Vice President of Auto East Division, with a $175,000.00 salary.  Under a commission-based pay system, Block-Victor had earned from $250,000.00 to $500,000.00 a year from 2001 through 2005.  On October 14, 2005, Block-Victor inadvertently discovered a management chart depicting that she was going to be removed from her Regional Vice President position and replaced by her 34-year-old subordinate, Anthony Schmidt.  On October 18, 2005, Evigna Chief Executive Officer ("CEO") Jeff Beckett told Block-Victor that she could no longer work from her home in the mornings, and that she had to either work 8:00 a.m. to 5:00 p.m. at the office, work part-time, or become a consultant.  Block-Victor asserts that, in contrast, younger salespersons Anthony Schmitt, Monique Erving, and Roberta Smith were permitted to work from home.  After protesting this proposed work-schedule change, Block-Victor was

2

permitted to remain working in the mornings from her home.  In November 2005, Executive Vice President David Morrison allegedly told co-plaintiff DaSilva that "[Block-Victor] was past her prime and should have known when to leave."  DaSilva Tr. at 152.  At a February 2006 National Sales Meeting, Block-Victor's Executive Vice President duties were formally taken away from her, and at the same meeting, she was presented with the 2005 "Most Profitable Salesperson of the Year" award.  Block-Victor was reassigned to the position of Strategic Account Director - GM/UAW.  On June 19, 2006, new Executive Vice President of Sales and New Business Development Barkey Clarke told Block-Victor that her salary was being "updated" effective July 1, 2006, from $175,000.00 to $100,00.00.  After the June 19, 2006 meeting, Block-Victor went on medical leave and did not return to Evigna.  Block-Victor was 67 years of age, and the oldest salesperson at Evigna.

Block-Victor argues that she was excluded from a New Business Development Team made up of Evigna owners Shan Mehta and CEO Beckett, and Executive Vice President Clarke, Executive Vice President Morrison, and Executive Vice President of Customer Care Mark Belanski.  Block-Victor asserts that she was likewise excluded from the Team's shared "War Room" office, and was only given new sales leads after she complained in 2006.  Block-Victor maintains that younger Evigna sales personnel had salaries comparable to her $175,000.00 salary, but their salaries were not reduced.

### B. Plaintiff DaSilva

According to DaSilva, after Evigna purchased Beanstalk in May 2004, but before the conversion of sales personnel from a commission-based pay to a salaried based pay on May 1, 2005, "there was conversation going around that [Evigna] wanted to replace all the older salespeople with younger sales people[.]"  DaSilva Tr. at 57.  DaSilva testified that she talked with Executive Vice President Belanski about the issue because she felt she had been interviewed for her own job by Evigna CEO Beckett, and because she observed

3

Evigna hire approximately six "undergrads right out of college." Id. at 57-58. According to DaSilva, when she asked Belanski "What is all this with them trying to replace the salespeople with younger people, thinking that they could just – that we were just order-takers?" Belanski made a comment to the effect that "yeah, that was something – that was a battle he was going to have to fight[.]" Id.

In August 2004, Steve Lemberg asked DaSilva to transfer to Bethesda, Maryland to serve as Evigna's on-site representative at Evigna client Avendra/Marriott[1]. DaSilva agreed to maintain and share responsibility with Executive Vice President Morrison for Evigna client Ford Motor Company. DaSilva was promoted to a Vice President position in January 2005, her salary was increased from $75,000.00 to $95,000.00, and she received a $6,250.00 bonus. In February 2005, Executive Vice President Belanski and DaSilva agreed that DaSilva would commute from Michigan to Avendra/Marriott in Maryland. David Granetz eventually took the on-site position at Avendra/Marriott. In June 2005, DaSilva's request to be relieved of her Ford account responsibilities was granted. From June 2005 through August 2005, Avendra/Marriott was DaSilva's only account. DaSilva returned to Evigna's Detroit Office in July 2005, commuting back and forth to Maryland. According to DaSilva, in September 2005, on the suggestion of Executive Vice President Morrison, Executive Vice President Belanski asked DaSilva to relocate to Florida as the Vice President of Hospitality Sales with a $105,000.00 salary. DaSilva was to help reconstruct a dysfunctional office located in Celebration, Florida. DaSilva permanently relocated to Florida in the Fall of 2005 while retaining her responsibilities for the Avendra/Marriott account.

---

[1] Avendra was Evigna's client. According to DaSilva, Marriott was a majority owner of Avendra. DaSilva Tr. at 29. At times, the parties refer to Avendra and Marriot interchangeably.

In January 2006, Evigna hired Executive Vice President of Sales Keith Amen, age 33. Amen became DaSilva's direct supervisor. Amen allegedly encouraged DaSilva to hire 34-year-old female Bevin Jacobson in Florida as the Disney Account Manager, over DaSilva's objections that Jacobson was over-qualified. Jacobson took the job based in part on representations by CEO Beckett and Executive Vice President Clarke that the Florida location was a growth office that might, in the future, support a second Vice President position. Jacobson was hired at a $95,000.00 salary, not the $75,000.00 salary offer DaSilva recommended.

Avendra's three-year contract with Evigna was to expire in December 2006. Avendra had become dissatisfied with Evigna's services. Executive Vice President Clarke met with Avendra's Georgie Gabor, and was allegedly told by Gabor that DaSilva needed more management support from Evigna. Gabor allegedly told Marriott Account Manager Granetz that Avendra did not want a management change, and that DaSilva should not be replaced. According to DaSilva, Clarke did not consult her. DaSilva allegedly learned instead from Gabor that she, DaSilva, was no longer on the Avendra account. DaSilva asserts that Jacobson was given the Avendra account even though Clarke admitted that Avendra was 90% satisfied with DaSilva, but only 50-60% satisfied with Evigna. DaSilva asserts that she was replaced as Vice President of Hospitality Sales in June 2006 by Jacobson. DaSilva maintains that she was thereafter presumably working as an Account Manager for the Marriott/Ritz Carlton Vacation Club account, with no direct report. On August 14, 2006, DaSilva was terminated due to "cost savings" as allegedly told to her by Clarke. DaSilva was 48 years of age.

### C. Plaintiff Nikkila

Nikkila worked as an Evigna Accounts Manager for clients Marriott, Daimler Chrysler, Oakwood Hospital, and Ford. Nikkila reported directly to co-plaintiff DaSilva,

initially making $45,000.00 a year.  Nikkila was promoted to Senior Account Manager in October 2005, making a $52,000.00 salary.  According to DaSilva, after an Evigna sales representative resigned, Executive Vice President Amen found that Nikkila would be a "good fit" to take over the Ritz Carlton account.  DaSilva Tr. at 160.  DaSilva believed that Nikkila was already being underpaid, and that it seemed like a reasonable request for Nikkila to ask for a raise.  DaSilva attests that, in response to the raise request, Amen told her that Evigna "could get other people for less money."  Id. at 161.  DaSilva attests that she assumed that Amen meant "younger" people because Evigna "kept hiring that age group."  Id.  Nikkila was terminated on August 14, 2006, allegedly due to "cost savings."

Jacobson allegedly assigned Nikkila's accounts to new hire Christina Coombes, age 23.  CEO Beckett directed Jacobson to hire Coombes without consulting DaSilva.  DaSilva testified that Executive Vice President Morrison asked her during a conversation "I'm trying to save [Nikkila] . . . .  She's such a beautiful girl . . . do you think there's something you can do to help her lose some weight?"  Nikkila was 48 years of age when she was discharged, and was 5-feet 6-inches tall and weighed 170 pounds.  Nikkila submits that younger, less experienced Account Managers earned as much or more than she did at $52,000.00 a year.

### D. Plaintiffs' Common Arguments

Plaintiffs argue that the only employees terminated in 2006 were DaSilva, Nikkila, Amen, and Steve Kinard, while nine young employees were hired in 2005 and 2006.  Plaintiffs assert that the top three Vice President level sales positions are held by Schmitt, age 38, Heidi Tracy, age 31, and Erving, age 40.  Plaintiffs proffer other age statistics to support their claims of age discrimination.  Plaintiffs argue that CEO Beckett wanted to transform Evigna's sales force into one of young, attractive women, citing Executive Vice President Morrison's testimony to the effect that Evigna was hiring young people, many of

6

whom were pretty women.  Morrison Tr. at 24-25.  DaSilva testified that Beckett would gather others such as Executive Vice President Morrison and Anthony Schmidt to accompany him to "ogle" younger female staff.  According to DaSilva, another Evigna employee told DaSilva in 2004 that she saw CEO Beckett standing with his hand on a newly hired female accountant's buttocks as he was talking to her at the copying machine.

### III. Recent Supreme Court Precedent

On June 18, 2009, the Supreme Court issued Gross v. FAL Financial Services, Inc., 129 S.Ct. 2343 (2009), holding that:

> [A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action.  The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision.

Id. at 2352.  "Unlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor."  Id. at 2349.  A panel of the Sixth Circuit has since recognized:

> Gross overrules our ADEA precedent to the extent that cases applied Title VII's burden-shifting framework if the plaintiff produced direct evidence of age discrimination.  Gross enunciated the correct standard for ADEA claims as whether the plaintiff has proven "by a preponderance of the evidence . . . . that age was the "but-for" cause of the challenged employer decision.

Geiger v. Tower Automotive, ___ F.3rd ___, No. 08-1314, 2009 WL 2836583, *4 (6th Cir. Sept. 4 2009) (quoting Gross, 129 S.Ct. at 2351).  The Geiger panel went on to articulate:

> While Gross specifically rejected the burden-shifting framework for claims of direct evidence . . . the Supreme Court expressly declined to decide whether the McDonnell Douglas test applies to the ADEA.  In a footnote, the majority noted that it "has not definitely decided whether the evidentiary framework of [McDonnell Douglas], utilized in Title VII cases is appropriate in the ADEA context."  Gross, 129 S.Ct. at 2349 n.2.  In this circuit, however, while recognizing the differences between Title VII and the ADEA, we have long found the McDonnell Douglas framework useful in analyzing circumstantial evidence of ADEA claims.  The McDonnell Douglas test thus remains applicable law in this circuit.  . . . . [W]e find that the McDonnell

7

<u>Douglas</u> framework can still be used to analyze ADEA claims based on circumstantial evidence.

<u>Id</u>. at *5.  As argued by plaintiffs in their supplemental brief, the <u>McDonnell Douglas</u> framework remains intact.

Plaintiffs also argue that the <u>Grose</u> Court's citation to <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604 (1993) indicates a recognition that an ADEA plaintiff may prevail by simply showing that age was "a motivating factor" in the employment.  <u>See</u> <u>Gross</u>, 129 S.Ct. at 2349-50.  After citing <u>Hazen Paper</u>, the Court states that "[t]o establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse action."  <u>Gross</u>, 129 S.Ct. at 2350 (citing <u>Bridge v. Phoenix Bond & Indemnity Co.</u>, 128 S.Ct. 2131, 2141-42 (2008) and <u>Safeco Ins. Co. of America v. Burr</u>, 551 U.S. 47, 63-64, and n. 14 (2007)).  The <u>Geiger</u> court held that "ELCRA claims are analyzed under the same standards as federal ADEA claims."  <u>Geiger</u>, 2009 WL 2836583 at *9 (citing <u>Blair v. Henry Filters, Inc.</u>, 505 F.3rd 517, 523 (6th Cir. 2007)).  "Although the burdens of production shift, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  <u>Blair</u>, 505 F.3rd at 524.

The Michigan Supreme Court has held that an ELCRA plaintiff alleging age discrimination must prove that "the plaintiff's age was *a motivating factor* in the employer's decision. <u>Town v. Michigan Bell Telephone Co.</u>, 455 Mich. 688, 697, 568 N.W.2d 64 (1997) (emphasis added).  <u>Gross</u> and <u>Geiger</u> court held that an ADEA plaintiff must prove "that age was the 'but-for' cause of the challenged employer decision."  <u>Geiger</u>, 2009 WL 2836583 at *4 (<u>quoting</u> Gross, 129 S.Ct. at 2351). This court will proceed accordingly. Noting these different standards, the court proceeds accordingly.

**IV. Standard of Review**

Evigna moves for summary judgment of each of the plaintiffs' claims.  Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001).  The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).  The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532.  If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  Anderson, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## V. Federal ADEA Claims

In analyzing ADEA claims on summary judgment, the plaintiff is required to proffer evidence of a prima facie case that: (1) the plaintiff was at least 40 years of age; (2) he or she was discharged; (3) he or she was qualified for the position; and (4) he or she was

replaced by a younger individual.  Skalka v. Fernald Environment Restoration Mgt. Corp., 178 F.3d 414, 420 (6th Cir. 1999).  "The fourth element may be satisfied by showing that 'similarly situated non-protected employees were treated more favorably.'"  Tuttle v. Metropolitan Government of Nashville, 474 F.3d 307, 317 (6th Cir. 2007) (quoting Talley v. Bravo Pitino Rest., 61 F.3d 1241, 1246 (6th Cir. 1995)).  In the context of a reduction in force ("RIF"), the fourth element of the prima facie case – that the plaintiff was replaced by a younger individual – is modified as requiring the plaintiff to proffer "additional evidence" tending to show that the employer "singled out the plaintiff for discharge for impermissible reasons."  Skalka, 178 F.3d at 420-21 (quoting Barnes v. GenCorp. Inc., 896 F.2d 1457, 1465 (6th Cir.), cert. denied, 498 U.S. 878 (1990)).

Once the plaintiff establishes a prima facie case, the defendant has the burden of producing evidence of a legitimate, non-discriminatory reason for the challenged adverse employment action.  Scott v. Goodyear Tire & Rubber Co., 160 F.3d 1121, 1126 (6th Cir. 1998).  If the defendant meets this evidentiary burden, the plaintiff is required to demonstrate that the defendant's proffered reason is a mere pretext for age discrimination. Id.  "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000).  Ultimately, the ADEA plaintiff must prove "by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action."  Gross, 129 S.Ct. at 2352.

Evigna does not dispute that each of the plaintiffs were at least 40 years of age in

2006, that each of the plaintiffs was qualified, or that plaintiffs DaSilva and Nikkila were discharged on August 14, 2006. Evigna does dispute that Block-Victor was constructively discharged in 2006, the second element of Block-Victor's prima facie case. Skalka, 178 F.3d at 420. Evigna also disputes that any of the plaintiffs were replaced by younger individuals or were singled-out for discharge because of their age, the fourth element of their prima facie cases. Id.

### A. Constructive Discharge - Block-Victor

To prove a constructive discharge, the plaintiff must produce evidence showing that: (1) the employer deliberately created intolerable working conditions as perceived by a reasonable person; and (2) the employer did so with the intention of forcing the employee to quit. Saroli v. Automation & Modular Components, Inc., 405 F.3d 446, 451 (6th Cir. 2005) (quoting Logan v. Denny's Inc., 259 F.3d 558, 568-69 (6th Cir. 2001)). Relevant factors in determining whether a reasonable person would have felt compelled to resign include whether there was: (1) a demotion; (2) a reduction in salary; (3) a reduction in job responsibilities; (4) a reassignment to menial or degrading work; (5) a reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. Saroli, 405 F.3d at 451 (quoting Logan, 259 F.3d at 569). The issue of the employer's intent focuses on "the reasonably foreseeable impact of the employer's conduct upon the employee." Held v. Gulf Oil Co., 684 F.2d 427, 432 (6th Cir. 1982) (citing Jacobs v. Martin Sweets Co., Inc., 550 F.2d 364 (6th Cir. 1977)).

Construing the record evidence in a light most favorable to Block-Victor, reasonable jurors could disagree whether Block-Victor was constructively discharged. Saroli, 405 F.3d at 451; Amway Distributors, 323 F.3d at 390. While it is beyond dispute that Block-Victor's

11

pay was initially reduced on May 1, 2005 to a $175,000.00 salary as part of an across-the-board elimination of commission-based pay, Block-Victor has proffered evidence that she was formally reassigned from the position of Regional Vice President to Strategic Account Director - GM/UAW in February 2006, that her younger subordinate Anthony Schmidt became her direct supervisor as a result of this reassignment, that her job responsibilities were reduced, and that her salary was to be reduced from $175,000.00 to $100,000.00 effective July 1, 2006 .  Reasonable jurors could conclude from this evidence that Block-Victor was demoted.  See Crady v. Liberty National Bank and Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993) (recognizing that a "demotion" may be "evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, diminished material responsibilities, or other indices that might be unique to a particular situation") (cited with approval in Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 886 (6th Cir. 1996)).  Block-Victor's proffered evidence of a demotion, a reduction in salary, a reduction in job responsibilities, and  reassignment to work under a younger supervisor would allow reasonable jurors to conclude that a reasonable person in Block-Victor's situation would have felt compelled to resign.  Saroli, 405 F.3d at 451.  Reasonable jurors could also conclude that Evigna could reasonably foresee that reassigning Block-Victor to work under her younger, former subordinate, reducing  her job responsibilities, and reducing her salary by 43% would have the impact of forcing Block-Victor to quit.  Id.; Held, 684 F.2d at 432.

Evigna has not produced indisputable evidence that Block-Victor's reassignment to the position of Strategic Account Director - GM/UAW in February 2006 did not reduce her former responsibilities as a Regional Vice President.  Schmidt testified that, consistent with the reassignment, he was directed by Executive Vice Presidents Belanski and Amen to supervise Block-Victor.  Schmidt Tr. at 27.  Schmidt further testified that Evigna management wanted him to become "the lead" by "overseeing the automotive accounts,"

formerly the responsibilities of Block-Victor.  Id. at 28.  Schmidt's testimony that he did not assume the actual responsibilities of Regional Vice President until October 2007 is contradicted by evidence that Block-Victor's reassignment was announced in February 2006, and Schmidt was directed to supervise her and oversee the automotive accounts before Block-Victor resigned on June 19, 2006.  A question of fact remains whether Block-Victor was constructively discharged on June 19, 2006.  Saroli, 405 F.3d at 451; Held, 684 F.2d at 432; Amway Distributors, 323 F.3d at 390.

### B. Collective Evidence of Age Discrimination

Plaintiffs rely collectively on certain evidence to support their individual age discrimination claims.

### i.  "Age Plus Sex" Discrimination

Plaintiffs argue that CEO Beckett wanted to transform Evigna's sales force into younger, sexually attractive women, relying on evidence that Beckett gathered others to "ogle" younger female staff members, that Beckett inappropriately touched a newly hired female accountant, and that Executive Vice President Morrison observed at his deposition that Beckett wanted young and pretty "pharmaceutical rep model-type" female salespersons.  Plaintiffs also rely on their own general observations that Evigna's new-hires were often young attractive females.

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]"  29 U.S.C. § 623(a)(1).  In contrast, Title VII of the Civil Rights Act of 1965 makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]"  42 U.S.C. § 2000e-2(a)(1).  "The purpose of the ADEA,

according to the Supreme Court, is to protect older workers from being 'deprived of employment on the basis of inaccurate and stigmatizing stereotypes,' and to ensure that employers evaluate their employees on the basis of their merits, and not their age." <u>Allen v. Diebold</u>, 33 F.3d 674, 676-677 (6th Cir. 1994) (quoting <u>Hazen Paper</u>, 113 S.Ct. 1701, 1706).  "Disparate treatment . . . captures the essence of what Congress sought to prohibit in the ADEA.  It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." <u>Hazen Paper</u>, 113 S.Ct. at 1706.

Plaintiffs' proffered evidence that Evigna, through CEO Beckett, was transforming Evigna's salesforce into younger sexually attractive women supports a Title VII claim of sex discrimination or "sex plus" discrimination[2], claims that are not before this court.  Plaintiffs admittedly are not advancing disparate impact claims.  The evidence of sex discrimination is not significantly probative of the ADEA issue of whether Evigna discharged Block-Victor, DaSilva, or Nikkila based on inaccurate and stigmatizing stereotypes leading Evigna to believe that the plaintiffs' productivity and competence had declined because they were over 40 years of age.  <u>Hazen Paper</u>, 113 S.Ct. at 1706; <u>Diebold</u>, 33 F.3d at 676-677. Plaintiffs' evidence tending to show that Evigna was transforming its sales force into sexually attractive women does not support the plaintiffs' ADEA claims.

### ii.  Statistics

---

[2]  A Title VII "sex plus" discrimination claim alleges that the plaintiff was subjected to disparate treatment based on her sex considered in conjunction with another characteristic.  The unfavorably treated protected subclass of women i.e. woman over 40 years of age in a "sex plus age" discrimination claim, are compared to the corresponding subclass of men, i.e. men over 40 years of age. <u>See</u> <u>Derungs v. Wal-Mart Stores, Inc.</u>, 374 F.3d 428, 431-432 (6th Cir. 2004).  <u>See</u> <u>also</u> <u>Philipsen v. University of Michigan Bd. of Regents</u>, No. 06-CV-11977-DT, 2007 WL 907822, *4 (E.D. Mich. Mar. 22, 2007); <u>Arnett v. Aspen</u>, 846 F.Supp. 1234, 1239-1240 (E.D. Pa. 1994).  Courts have rejected "age plus" theories of discrimination under the ADEA. <u>See</u> <u>Luce v. Dalton</u>, 166 F.R.D. 457, 460-461 (S.D. Cal. 1996).

"Appropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class." Bender v. Hecht's Department Stores, 455 F.3d 612, 622 (6th Cir. 2006) (quoting Barnes v. GenCorp Inc., 896 F.2d 1457, 1466 (6th Cir. 1990) (citing Laugesen v. Anaconda Co., 510 F.2d 307, 317 (6th Cir. 1975))). "To do so, the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity." Bender, 455 F.3d at 622 (citing Segar v. Smith, 738 F.2d 1249, 1274 (D.C. Cir. 1984) (emphasis in original). A statistic demonstrating "that younger workers are hired and older workers leave or are not promoted does not, in and of itself, prove age discrimination." Kittredge v. Parker Hannifen Corp., 597 F.Supp. 605, 610 (W.D. Mich. 1984). This is because "discharged employees will more often than not be replaced by younger workers[.]" Id. (quoting Laugesen, 510 F.2d at 312).

Plaintiffs' proffered chart depicting that Evigna's average age for new hires from July 1, 2004 through December 1, 2007 was 33.1 does not create a reasonable inference of age discrimination. Plaintiffs' Exhibit 4. The chart also shows that 10 of the 49 new-hires were over 40 years of age when hired, roughly 20.4 %. Id. The exhibit further depicts that, of the 49 new-hires, 15 were discharged during the same time frame, of which 10 of the 15, or 66%, were younger than age 40. The statistic that the average age for Evigna new-hires from July 1, 2004 through December 1, 2007 was 33.1 does not support a reasonable inference of age discrimination. Bender, 455 F.3d at 622; Kittredge, 597 F.Supp. at 610.


Plaintiffs' assertion that only DaSilva, Nikkila, Amen, and Kinard were discharged in 2006 is contradicted by Plaintiff's Exhibit 4. The Exhibit depicts that, along with DaSilva,

Nikkila, Amen, and Kinard[3], six other Evigna employees were terminated in 2006: Vincent Yardum, Stephen Brien, Joanne Knudson, Executive Vice President Clarke, Kellie Reeves, and Executive Vice President Morrison.  Plaintiff's Exhibit 4.  Four of the ten employees terminated in 2006, Amen, Yardum, Brien, and Reeves, were under the age 40.  Id.  According to Plaintiff's Exhibit 4, four of twenty-one employees hired by Evigna in 2005 and 2006 (21%) were older than 40 years of age.  Plaintiffs' argument that only DaSilva, Nikkila, Amen, and Kinard were discharged in 2006 is not supported by Exhibit 4.  The statistics derived form Plaintiff's Exhibit 4 do not raise a reasonable inference of age discrimination.  Bender, 455 F.3d at 622; Kittredge, 597 F.Supp. at 610.

Plaintiffs rely on evidence that three of the five Vice President positions formerly held by Block-Victor, DaSilva, Kinard, Rob Mainthow, and Bill Hersch, all over age 40, are now occupied by employees under 40 years of age: Schmidt (age 38), Heidi Borowski/Tracy (age 31), and Erving (age 40).  Absent evidence of the circumstances surrounding Kinard's, Mainthow's, and Hersch's departure from Evigna, this distribution of Vice President positions does not raise a reasonable inference of age discrimination.  Bender, 455 F.3d at 622; Kittredge, 597 F.Supp. at 610.

Construed in a light most favorable to the plaintiffs, and upon close examination of the plaintiffs' statistical evidence, both separately and in total, the statistical evidence does not raise a reasonable inference that Evigna adopted a corporate-wide initiative of age discrimination.  Amway Distributors, 323 F.3d at 390.

### iii. Evidence of Non-RIF

Plaintiffs have proffered sufficient evidence to dispute that Evigna was experiencing a bona fide RIF when Block-Victor was allegedly discharged on June 19, 2006, and when

---

[3]  DaSilva is not depicted on the chart as having been terminated.

DaSilva and Nikkila were discharged on August 14, 2006.  Evigna had experienced a modest profit by mid-2005.  Plaintiffs proffered statistics do indicate that Evigna continued hiring new employees throughout 2005 and 2006.  Executive Vice President Belanski's testimony that Evigna staffing costs were "looked at every day," and that "[c]ost cutting is still going on," does not establish beyond reasonable dispute that Evigna was undergoing a RIF in 2006.  See Belanski Tr. at 197-198.  Accordingly, plaintiffs are not required to proffer "additional evidence" that Evigna singled then out for discharge for impermissible reasons.  Barnes, 896 F.2d at 1465.  Plaintiffs may establish the fourth element of their respective prima facie cases with evidence that they were replaced by a younger individual, or that similarly situated employees under the age of 40 were treated more favorably. Skalka, 178 F.3d at 420; Tuttle, 474 F.3d at 317.

### iv.  Alleged Age-Related Statements by Morrison, Amen, and Belanski

DaSilva testified that: (1) Executive Vice President Morrison told her in November 2005 that Block-Victor "was past her prime and should have known when to leave"; (2) Executive Vice President Belanski told her in 2004 that the issue of Evigna replacing existing salespeople with younger people "was a battle he was going to have to fight"; and (3) Executive Vice President Amen told her in response to a raise request for Nikkila that Evigna "could get other people for less money."  Plaintiffs represented in their Response Brief that they "do not contend that the statements are direct evidence," but rather, that "the comments which demonstrate an age biased mindset by Defendants' management team do constitute relevant and admissible circumstantial evidence of age discrimination[.]" Plaintiffs' April 20, 2009 Response Brief, at 21-22 n.28.  Plaintiffs relied solely on the McDonnell Douglas circumstantial evidence approach in opposing Evigna's motion for summary judgment of their ADEA claims.  Id. at 20-21, 32.  Plaintiffs' Counsel asserted at

17

the July 7, 2009 hearing, however, that the statements do constitute direct evidence of age discrimination.

"Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Geiger, 2009 WL 2836583 at *4. (quoting Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (en banc)). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." Id. (citing Wexler, 317 F.3d at 570). "Statements by nondecisionmakers, or statements by decision-makers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . . of demonstrating animus." Geiger, 2009 WL 2836583 at *4 (quoting Bush v. Dictaphone Corp., 161 F.3d 363, 369 (6th Cir. 1998)). "Isolated and ambiguous comments 'are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.'" Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 355 (6th Cir. 1998) (quoting Phelps v. Yale Sec.. Inc., 986 F.2d 1020, 1025 (6th Cir. 1993)).

The alleged statements of Morrison, Belanski, and Amen do not constitute direct or indirect evidence of age discrimination. The statements are not direct evidence of age discrimination because none of the statements requires a finding that Evigna adopted a corporate initiative of discharging sales employees based on their age, and applied that policy to Block-Victor, DaSilva, or Nikkila. Geiger, 2009 WL 2836583 at *4. Morrison was not a decisionmaker with respect to hiring and discharging employees. Id. Read in context, Belanski's alleged statement is ambiguous as it could be reasonably construed as conveying his battle against a corporate perception "that [sales-people] were just order-takers[.]" DaSilva Tr. at 57-58. Ercegovich, 154 F.3d at 355. Amen's alleged comment in response to DaSilva's request for a salary increase for Nikkila, that Evigna "could get

18

*other* people for less money" is even more ambiguous, simply conveying that Nikkila's request for a salary raise was unwarranted.  Id.   Absent direct evidence of age discrimination, the court continues it's analysis of the plaintiffs' claims under the McDonnell Douglas framework.  Geiger, 2009 WL 2836583 at *4.

## C. Individual Claims of Age Discrimination

Each plaintiff has produced evidence to support the first three elements of their individual prima facie claims of age discrimination, that she was at least 40 years of age, that she was qualified for her position at Evigna, and that she was discharged.  Skalka, 178 F.3d at 420. It remains for each plaintiff to demonstrate the fourth element of her prima facie case, that she was replaced by a younger individual or was treated less-favorably than a similarly situated Evigna employee under the age of 40.  Skalka, 178 F.3d at 420; Tuttle, 474 F.3d at 317.  Upon meeting such burden of proof, each plaintiff's ADEA claim must be evaluated separately under the McDonnell Douglas framework.  Gross, 129 S.Ct. at 2351; Geiger, 2009 WL 2836583 at *4; Reeves, 530 U.S. at 141-143.

### i. Block-Victor

Block-Victor has come forward with evidence demonstrating the fourth element of her prima facie case, that she was replaced by her younger 34-year-old subordinate Anthony Schmidt as Regional Vice President of Auto East Division.  Skalka, 178 F.3d at 420.  Evigna's argument that Schmidt never assumed a position entitled "Regional Vice President of Auto East Division" elevates form over substance.  The record supports a finding that Schmidt was promoted to Block-Victor's Vice President position, that Block-Victor was demoted to a GM/UAW Account Director position, that Schmidt became Block-Victor's supervisor, and that Evigna management directed Schmidt to take "the lead" by "overseeing the automotive accounts."  Block-Victor was not required to proffer "additional evidence" that she was singled out for reassignment, as is required in cases where the

employer was experiencing a <u>bona fide</u> RIF.  <u>See</u> Section V, B, iii, <u>supra</u>.

Block-Victor has also come forward with evidence to rebut as pretext Evigna's proffered reason for reducing her salary from $175,000.00 to $100,000.00, that the reduction was part of continuing "cost cutting" efforts and a realignment of comparable salaries.  <u>Scott</u>, 160 F.3d at 1126; <u>Dews</u>, 231 F.3d at 1021.

> [T]he ADEA prohibits only actions actually motivated by age and does not constrain an employer who acts on the basis of other factors - pension status, seniority, wage rate - that are empirically correlated with age.  Of course, an employer may not use any of these factors as a proxy for age, but age itself must be the motivating factor behind the employment action in order to constitute an ADEA violation.

<u>Diebold</u>, 33 F.3d at 676 (citing <u>Hazen Paper</u>, 113 S.Ct. at 1706).  Evigna offers no explanation why Block-Victor was reassigned from a Vice President position to an Account Director position in February 2006 after receiving the 2005 "Most Profitable Salesperson of the Year" award.  Reasonable persons could conclude that Block-Victor was demoted in February 2006 because of her age, and that this age-based demotion was the "but for" motivation for "realigning" her $175,000.00 to $100,000.00 as a "proxy" for age discrimination.  <u>Id</u>.  Block-Victor's <u>prima facie</u> case, combined with sufficient evidence to rebut Evigna's justification for reassigning her and reducing her salary, would permit a reasonable jury to conclude that Evigna unlawfully discriminated against Block-Victor because of her age.  <u>Gross</u>, 129 S.Ct. at 2351; <u>Geiger</u>, 2009 WL 2836583 at *4; <u>Reeves</u>, 530 U.S. at 148; <u>Amway Distributors</u>, 323 F.3d at 390.

The court reaches this conclusion notwithstanding its agreement with Evigna that reasonable inferences of age discrimination are not raised by: (1) CEO Beckett telling Block-Victor that she could no longer work from home in the morning; (2) Block Victor's exclusion from the New Business Development Team and "War Room" office; or (3) Block-Victor's receipt of a new sales lead after complaining in 2006.  Block-Victor was permitted

to continue working from home once she complained about her proposed schedule change. It is undisputed that Block-Victor was not an owner of Evigna, nor an Executive Vice President after she was placed on salary on May 1, 2005, as were all the members of the New Business Development Team and occupants of the "War Room." Block-Victor was given new sales leads upon request.

The court reiterates that nondecisionmaker Executive Vice President Morrison's November 2005 comment that Block-Victor "was past her prime and should have known when to leave" does not constitute indirect or circumstantial evidence of age discrimination. Geiger, 2009 WL 2836583, at *4.

> In assessing the relevancy of a discriminatory remark, we look first at the identity of the speaker. An isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of age discrimination. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1161 (6th Cir.1990) ("[S]tatement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official."). This court later explained, however, that the McDonald rule was never intended to apply formalistically, and that remarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, were relevant. See Wells, 58 F.3d at 237-38; see also Kelley v. Airborne Freight Corp., 140 F.3d 335, 347-48 (1st Cir.1998) (statement by head of human resources who "participated closely" in plaintiff's termination was admissible to show a discriminatory atmosphere); Abrams v. Lightolier Inc., 50 F.3d 1204, 1214 (3d Cir.1995) (age-related statements of corporate vice president who may have "played a role" in the decision to terminate the plaintiff were relevant and could "properly be used to build a circumstantial case of discrimination"). Similarly, the discriminatory remarks of those who may have influenced the decision not to reassign the plaintiff to other positions in the company may be relevant when the plaintiff challenges the motive behind that decision.

Ercegovich, 154 F.3d at 354-355. Plaintiffs' proffered evidence that Morrison shared the "War Room" office with those who did have the authority to reassign Block-Victor and reduce her salary is insufficient to raise a reasonable inference that Morrison influenced or played a meaningful role in those decisions. Block-Victor's argument that Morrison was

echoing the thinking of Evigna's decisionmakers is unsupported by record evidence.

As reasoned, however, Block-Victor has come forward with other evidence that would allow a reasonable jury to ultimately conclude that she would not have been constructively discharged "but for" her age.  Gross, 129 S.Ct. at 2351; Geiger, 2009 WL 2836583 at *4; Reeves, 530 U.S. at 148; Amway Distributors, 323 F.3d at 390.  Evigna's motion for summary judgment of Block-Victor's ADEA claim will be denied.

### ii. DaSilva

DaSilva has come forward with evidence demonstrating the fourth element of her prima facie case, that she was replaced by the younger 34-year-old Bevin Jacobson as Vice President of Hospitality Sales in June 2006.  Skalka, 178 F.3d at 420.   Evigna's arguments that DaSilva was not discharged until two months later, on August 16, 2006, ignores the crux of DaSilva's claim, that Evigna replaced her with the younger Jacobson as the Vice President of Hospitality Sales based on age, leaving DaSilva vulnerable to discharge from her new position as an Account Manager due to her higher salary and resulting lack of accounts.  See Plaintiffs' Response Brief, at 14-15.

DaSilva does not dispute that, from June 2005 through August 2005, her only account was the Avendra/Marriot account, and that she agreed to transfer to Florida in September 2005 while retaining her responsibilities for the Avendra/Marriot account.  Also, DaSilva does not dispute that, during this period while she was acting as the Vice President of Hospitality Sales, Avendra became dissatisfied with Evigna.  Avendra's contract with Evigna was about to expire in December 2006.  DaSilva proffers evidence that Avendra's Gabor told Executive Vice President Clarke that DaSilva needed more support from Evigna, that Gabor indicated to Marriot Account Manager Granetz that DaSilva should not be replaced, and that Executive Vice President Clarke scored DaSilva as having a 90% approval rating with Avendra while Evigna merited only a 50-60% rating.

22

Clarke testified at his deposition:

Q.  So the decision [to remove DaSilva from the Avendra/Marriot] account was made by Evigna management and communicated to Ms. Gabor?

A. [by Clarke] That's correct.

Q.  She expressed her displeasure?

A.  That's correct.

Q.  And did you consider changing the company's strategy and putting Ms. DaSilva back on the account?

A.  No.

Q.  Why not?

A.  Because it was a management decision that I made what I felt like what would be best for both parties.

Q.  Well, didn't it impact you to know that the client was very angry about this decision?

A.  The client doesn't manage my company, they manage theirs.

Q.  But the client can pull their account from your company, can't they?

A.  That was a risk I was willing to take.

Q.  Well, what was so compelling about Ms. DaSilva to prompt you to pull her from these two accounts?

A.  It wasn't about the person.  It was about the situation and how it basically had just spiraled down.  She was part of a very negative experience with that customer.  The frustration was apparent on both sides.  I just felt like we needed a change.

Q.  But if it was so negative, what doesn't make sense to me is if the relationship was so negative, then why is it that this customer is angry that you've removed the one salesperson that she likes?

A.  I don't know that she was angry.  I think she was disappointed.

Q.  Well, if she was so – if the relationship was so negative –

A.  No, you misunderstood me.  I said the situation was negative.  I didn't say she was negative towards Lisa.

23

*       *       *

Q. So what was it about the relationship with Avendra and Marriott that was negative?

A.  That we had not performed, we had put a salesperson in position of not being supported and not being able to come through and deliver on things that we had promised the client, our customer, yeah.

Q.  So you would agree that the failure to perform was not the fault of Ms. DaSilva, correct?

A.  Not totally, no.

Q.  And isn't it true that the client was not displeased with Ms. DaSilva's performance?

A.  Not overall, no, absolutely not.  They had – if you are talking about from a percentage standpoint, they were 80, 90 percent approval, but there were some things they felt like she could have pushed harder for, in a more timely manner, but overall as a management team I would take total responsibility for failing at that account and having it in the situation it was in.

Q.  With the 80 to 90 percent approval from the client?

A.  Yes.

Q.  Okay.  Let me get this straight.  So fair to say the client is 80 to 90 percent satisfied with Ms. DaSilva in your estimation?

A.  As a salesperson and as a person, yes.

Q.  And do you think that the client was 80 to 90 percent satisfied with Avendra's [sic, Evigna's] performance?

A.  Absolutely not.

Q.  So as far as – with regard to Evigna's performance, what would you say was the percentage of satisfaction there?

A.  50 to 60.

Q.  So with a 50 to 60 percent approval rating for the company, it was management's decision to remove the Sales VP that was experiencing an 80 to 90 percent satisfaction rating?

A.  That is correct.

Q.  And who was it that made that decision?

A.  I did.

Q.  Did you make that decision with anybody else?

A.  Myself and Mark Belanski, but I gave Mark my recommendation.  I just felt like Lisa was beaten up from that total experience.  I just thought we needed fresh blood, somebody to implement a new plan and move on.

Clarke Tr. at 66-69.

Clarke's testimony meets Evigna's burden of producing evidence of a legitimate reason for removing DaSilva from her position as Vice President of Hospitality Sales in June 2006 , to wit, that while DaSilva was responsible as a Vice President for servicing the Avendra/Marriott account, Evigna's business relationship with Avendra/Marriott "spiraled down" to a "negative situation" in which Evigna became unable to provide promised benefits to Avendra/Marriott.  DaSilva may show that Clarke's "business judgment" is a pretext for age discrimination by producing evidence of "sufficient significance itself to call into question the honesty of . . . the explanation," or evidence demonstrating that this "business judgment  [is] so riddled with error that defendant could not have relied upon it." Bender v. Hecht's Department Stores, 455 F.3d 612, 627 (6th Cir. 2006) (quoting Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003)).

DaSilva's assertion that Clarke's explanation is "illogical" is not well taken.  Reasonable jurors could not dispute that it was logical for Clarke to conclude that a favorable client relationship between Evigna and Avendra/Marriott outweighed Gabor's and Avendra's favorable relationship with DaSilva.  It was logical for Clarke to hold DaSilva ultimately responsible for the "negative situation" at Avendra/Marriott as the leader of Evigna's management team at Avendra/Marriott even though DaSilva was perceived by Clarke as having an 80 to 90 percent approval rating with Avendra/Marriott.  The legitimacy of Clarke's reasoning is bolstered by his willingness to risk losing the Avendra/Marriott

25

account by taking DaSilva off the account.  Clarke's failure to consult DaSilva about the decision, and DaSilva's learning form Gabor that she had been removed from the account, do not raise reasonable inferences of age-based animus.  DaSilva's argument that Clarke's decision was "illogical" is not supported by the record evidence.  <u>Bender</u>, 455 F.3d at 627.  Reasonable jurors could not conclude that Clarke's reasoning has no basis in fact, did not motivate his decision, or was insufficient to warrant removing DaSilva from her Vice President position.  <u>Id</u>.; <u>Dews</u>, 231 F.3d at 1021; <u>Amway Distributors</u>, 323 F.3d at 390.

Belanski's alleged 2004 statement regarding "a battle he was going to have to fight" is too isolated from DaSilva's June 2006 reassignment and August 16, 2006 discharge, and too ambiguous, to rebut Clarke's proffered legitimate reasoning and reasonably support a finding of age discrimination.  <u>Ercegovich</u>, 154 F.3d at 355; <u>Bender</u>, 455 F.3d at 627; <u>Dews</u>, 231 F.3d at 1021.

Evigna's hiring of Jacobson in 2006 does not raise a reasonable inference of age-discrimination.  DaSilva testified that there were a couple of unspecified candidates she was looking to hire when Executive Vice President Amen called her and said he wanted her "to take a look at Bevin."  DaSilva Tr. at 51.  DaSilva looked at Jacobson's record and believed she was "overqualified and wants too much money."  <u>Id</u>.  According to DaSilva:

> A. [by DaSilva] . . . .  Once January hit, I was begging.  Melanie and I were staying there until 9:00 or 10:00 every single night and getting phone calls from all over the country all the time, and neither one of us had ever lived through that scenario before.  It was new to both of us.
>
> By the end of January, I was – I had sent an e-mail that I think may be on record somewhere to Marc Belanski just begging, "Please, if Bevin is the one you want, I'll take anyone at this point, because we have to have another body here to help."
>
> And that's when they hired Bevin at $75,000.00.

DaSilva Tr. at 52.  DaSilva's testimony to the extent that Jacobson was pretty and attractive does not support a reasonable inference of age discrimination.  <u>See</u> Section V, B, i, <u>supra</u>.

26

DaSilva has failed to come forward with evidence to rebut as a pretext for age discrimination her June 2006 reassignment from Vice President of Hospitality Sales to Account Manager, and the appointment of Jacobson as her replacement.  <u>Dews</u>, 231 F.3d at 1021; <u>Bender</u>, 455 F.3d at 627; <u>Amway Distributors</u>, 323 F.3d at 390.   Construed in a light most favorable to DaSilva, reasonable jurors could not conclude on this record that she would have been retained on August 16, 2006 "but for" her age.  <u>Gross</u>, 129 S.Ct. at 2351; <u>Geiger</u>, 2009 WL 2836583 at *4; <u>Reeves</u>, 530 U.S. at 148; <u>Amway Distributors</u>, 323 F.3d at 390.   Evigna's motion for summary judgment of DaSilva's ADEA claim will be granted.

### iii.  Nikkila

Nikkila has come forward with evidence demonstrating the fourth element of her <u>prima</u> <u>facie</u> case, that she was replaced by the younger 23-year old Christina Coombe.  <u>Skalka</u>, 178 F.3d at 420.  "A person is replaced . . . when another employee is hired or reassigned to perform the plaintiff's duties."  <u>Grosjean v. First Energy Corp.</u>, 349 F.3d 332, 336 (6th Cir. 2003).  Coombes was hired on May 15, 2006.  Plaintiffs' Exhibit 4.  Nikkila was discharged on August 14, 2006, three months later.  <u>Id</u>.  Nikkila testified that Jacobson delegated her  accounts to Account Manager David Granetz.  Nikkila Tr. at 92.  Granetz attests that "Bevin Jacobson requested that I take on all of Ms. Nikkila's work, which I refused to do since I was not able to handle the additional work load in addition to my current workload."  Plaintiffs' Exhibit 16, ¶ 41, at 6.  Granetz continues by attesting that "newly hired Evigna employee Christina Coombes [Bauer] was assigned Ms. Nikkila's work after Ms. Nikkila was no longer with the company."  Plaintiffs' Exhibit 16, ¶ 44, at 6.

As a legitimate reason for discharging Nikkila, Executive Vice President Clarke testified:

Q.  Well, what was the methodology that was utilized by the management to

select . . . Ms. Nikkila for reduction?

A. [by Clarke] Account responsibility and basically pay amounts for job function.

*       *       *

Q. So were you looking at payroll spreadsheets or their sales figures?

A. Both. It was account responsibility, account activity production, number of accounts and some other criteria that was used at the time, I think, but more than anything it was Sudesh looking at payroll.

Q. So who was it that volunteered the names of Ms. DaSilva and Ms. Nikkila?

A. Nobody had to volunteer them. It was there. It was glaring when you looked at account responsibility, where everybody was, the amount of accounts they had, the account revenue that was being produced under those things and at the time I can't recall exactly what that was, but that was a part of it.

Clarke T. at 83-84. To establish pretext, Nikkila proffers evidence that others with wages on par or in excess of Nikkila's salary of $57,000.00 were not discharged: Lopez ($40,062.00); Kolowicz ($42,375.00); Baumgartner ($45,741.65); Hilbert ($49,999.00); Sheehan ($56,791.65); Ersch ($59,537.00); Jacobson ($95,000.00); and (Granetz $95,000.00).

For employees to be comparable for purposes of demonstrating unlawful discrimination, the employees must be "similarly situated in all relevant respects." Ercegovich, 154 F.3d at 352. Courts should make "an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." Id.

> The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as this court has held in Pierce, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects."

Id. (emphasis in original) (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802

28

(6th Cir. 1994)).  As set forth below, Nikkila has failed to demonstrate that other employees retained by Evigna were similarly situated in all relevant aspects.

Nikkila's proffering of eight Evigna employees' salaries fails to be rebut as pretext that Clarke legitimately chose Nikkila for discharge based on her salary *as well as* her account responsibility, account production, and number of accounts in comparison to other Evigna employees. Dews, 231 F.3d at 1021; Bender, 455 F.3d at 627; Amway Distributors, 323 F.3d at 390.  Nikkila's salary figures for the eight Evigna employees and reference to management charts fails to establish that these employees were similarly situated with Nikkila, a Senior Account Manager, in the relevant aspects of account responsibility, account production, and number of accounts, factors used by Clarke in deciding who to discharge.  Indeed, Jacobson, making a $95,000.00 salary, held a Vice President position, while Granetz, also making a $95,000.00 salary, was a Strategic Accounts Director. Plaintiffs' Exhibit 2.  At $57,000.00 a year, Nikkila made more than Lopez ($40,062.00), Kolowicz ($42,375.00), Baumgartner ($45,741.65), Hilbert ($49,999.00), and Sheehan ($56,791.65).  Although Ersch, age 32, made a $59,537.00 salary, $2,537.00 a year more than Nikkila, Nikkila has not shown that their salaries and comparable account responsibilities raise a reasonable inference that Ersch should have been chosen for discharge under Clarke's criteria. Ercegovich, 154 F.3d at 352.  Amen's alleged comment to DaSilva that Evigna "could get other people for less money" in response to Nikkila's raise request is ambiguous, and does not give rise to a reasonable inference of age discrimination. Id. at 355.  DaSilva herself testified that ". . . Kim [Nikkila] wasn't in a strong sales position[,] [s]o, she would have been easily dispensable from the get-go."  DaSilva Tr. at 79.

Construed in a light most favorable to Nikkila, reasonable jurors could not conclude on this record that Nikkila  would not have been discharged on August 16, 2006 "but for"

29

her age.  Gross, 129 S.Ct. at 2351; Geiger, 2009 WL 2836583 at *4; Reeves, 530 U.S. at 148; Amway Distributors, 323 F.3d at 390.  Evigna's motion for summary judgment of Nikkila's ADEA claim will be granted.

## VI. Block-Victor's State ELCRA Claim

Evigna concedes, as it must, that Block-Victor's claim of age discrimination under Michigan's ELCRA would survive summary judgment if her federal ADEA claim survived summary judgment.  See Geiger, 2009 WL 2836583 at *9 (citing Blair, 505 F.3rd at 523). Consistent with the court's denial of Evigna's motion for summary judgment of Block-Victor's ADEA claims on determining that reasonable jurors could conclude that she would not have been constructively discharged "but for" her age, the court likewise finds that reasonable jurors could also conclude that Block-Victor's age was "a motivating factor" in the decision to constructively discharge her.  Town, 455 Mich. at 697; Amway Distributors, 323 F.3d at 390.  Evigna's motion for summary judgment of Block-Victor's ELCRA age discrimination claim will be denied.

## VII. DaSilva's and Nikkila's ELCRA Claims

28 U.S.C. § 1367(a) provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by federal statute, in any action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

A state claim and a federal claim form part of the same case or controversy under Article III where "the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" United Mine Workers of America v. Gibbs, 383 U.S. 715, 725 (1966).

DaSilva's and Nikkila's federal ADEA claims will be dismissed on summary judgment, leaving only their state law ELCRA claims.  DaSilva's and Nikkila's ELCRA discrimination claims are not so related to Block-Victor's remaining federal ADEA claim as to permit a conclusion that Block-Victor's, DaSilva's, and Nikkila's claims comprise but one case.  Gibbs, 383 U.S. at 725.  As illustrated herein, each of the plaintiffs' claims requires a separate legal and factual analysis.  Block-Victor's remaining federal ADEA claim, premised on her alleged June 19, 2006 constructive discharge, is not so related to DaSilva's and Nikkila's remaining state ELCRA claims, premised on their respective August 14, 2009 discharges, as to form the same case or controversy under Article III of the United States Constitution.  28 U.S.C. § 1367(a); Gibbs, 383 U.S. at 725.

28 U.S.C. § 1367(c) provides:

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if –

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional cases, there are other compelling reasons for declining jurisdiction.

Whether to exercise supplemental jurisdiction is a matter for the court's discretion. Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 (1988) (citing Gibbs, 383 U.S. at 726).

"A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." Musson Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1254 (6th Cir.1996) (citation omitted). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." Id. at 1254-55 (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614,

98 L.Ed.2d 720 (1988)); see also Brandenburg v. Housing Authority of Irvine, 253 F.3d 891, 890 (6th Cir.2001) ("In fact, the usual course is for the district court to dismiss state-law claims without prejudice if all federal claims are disposed of on summary judgment."); Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1412 (6th Cir.1991) (noting that only "overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial").

Andonian v. Autoalliance International, Inc., No. 01-CV-73918-DT, 2003 WL 2010745, at

*18  (Feb. 25, 2003).


        All of DaSilva's and Nikkila's federal claims over which this court has original

jurisdiction will be dismissed on summary judgment.  No overwhelming interests in judicial

economy weigh in favor of exercising supplemental jurisdiction over DaSilva's and Nikkila's

remaining state law ELCRA claims.  The court declines to exercise supplement jurisdiction

over DaSilva's and Nikkila's state law ELCRA claims.  § 1367(c)(1); Cohill, 484 U.S. at 350;

Andonian, 2003 WL 2010745, at *18.

        The court also declines to exercise supplemental jurisdiction over DaSilva's and

Nikkila's remaining state law ELCRA claims under § 1367(c)(2) because these state law

claims would predominate over Block-Victor's remaining claims.  DaSilva's and Nikkila's

state law ELCRA claims would require proofs distinct from Block-Victor's claims, causing

a substantial expansion of the lawsuit beyond that necessary and relevant to Block-Victor's

claims.  Rugumbwa v. Betten Motor Sales, 200 F.R.D. 358, 368 (W.D. Mich. 2001).  See

also Wrack v. City of Detroit, No. 2:07-CV-12196, 2007 WL 2121995, *6 (E.D. Mich. July

24, 2007) (recognizing that district court may properly decline supplemental jurisdiction

under § 1367(c)(2) where state law claims would require inapplicable evidence, additional

witnesses, and expanded jury instructions).

        DaSilva's and Nikkila's remaining state law ELCRA claims will be dismissed, without

prejudice, as the court declines to exercise supplemental jurisdiction over these state law claims.  Cohill, 484 U.S. at 350.

## VIII. Conclusion

For the reasons set forth above, defendant Evigna's motion for summary judgment is hereby GRANTED, IN PART, as to plaintiffs Lisa DaSilva's and Kimberly Nikkila's claims of age discrimination in violation of the ADEA.  DaSilva's and Nikkila's federal ADEA claims are hereby DISMISSED with prejudice.   DaSilva's age discrimination claim under Michigan's ELCRA, and Nikkila's age and weight discrimination claims under Michigan's ELCRA, are hereby DISMISSED, without prejudice, with the court declining to exercise supplemental jurisdiction over these state law ELCRA claims.  Defendant Evigna's motion for summary judgment is hereby DENIED, IN PART, as to plaintiff Elaine Block-Victor's claims of age discrimination under the ADEA and Michigan's ELCRA.

SO ORDERED.

Dated:  October 13, 2009

> s/George Caram Steeh
> GEORGE CARAM STEEH
> UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on October 13, 2009, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk

---